**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

ADAM PRITCHARD and EDWARD ROBINSON,[1]

                Plaintiffs,                        04-CV-534-A
                                              **DECISION AND ORDER**

     v.

THE COUNTY OF ERIE; PATRICK M. GALLIVAN,
both individually and in his official capacity as the
Sheriff of the County of Erie; TIMOTHY HOWARD,
both individually and as the Undersheriff of the County
of Erie; DONALD J. LIVINGSTON, both individually and
as Acting Superintendent of the Erie County Correctional
Facility; ROBERT HUGGINS, both individually and as
Deputy Superintendent of the Erie County Correctional
Facility; and H. McCARTHY GIBSON, both individually
and as Superintendent of the Erie County Holding Center,[2]

                Defendants.
_____

DEDRICK WILLIAMS, MARQUESSA PAGE, and
CAMILE SMITH, individually and on behalf of a certified
class of others similarly situated,

                Plaintiffs,                        06-CV-291-A
                                              **DECISION AND ORDER**

     v.

THE COUNTY OF NIAGARA; THOMAS BEILEIN, both
individually and in his official capacity as Sheriff of the
County of Niagara; SAMUEL MUSCARELLA, both
individually and as Undersheriff of the County of Niagara;
and JOHN SAXTON, both individually and as Major in
the Niagara County Sheriff's Office,

---

[1]  Julenne Tucker was a Plaintiff in the _Erie_ action when the case was filed.  The Court, however, granted counsel's motion to withdraw from representing Plaintiff Tucker, and the Court also declined to make Plaintiff Tucker a class representative.  _See_ Docket No. 264 at 1 n.1.  In addition, this case was brought on behalf of a putative class that the Court eventually certified.  For the reasons discussed below, the Court decertifies the class.  Thus, the only Plaintiffs who remain in case 04-CV-534-A are Adam Pritchard and Edward Robinson, and both proceed only on their own behalf.

[2]  Each of the individual Defendant's successors-in-office "is automatically substituted as a party" for all official-capacity claims against the individual Defendants.  Fed. R. Civ. P. 25(d).

Defendants.

_____

These class actions challenge alleged policies in Erie County and Niagara County requiring strip searches of detainees held in the Erie County Holding Center (ECHC), the Erie County Correctional Facility (ECCF), and the Niagara County Jail (NCJ). The Plaintiffs in both cases allege that Erie County and Niagara County, together with the individual Defendants—high-ranking officials in each County's Sheriff's Office—maintain policies requiring that all new detainees at the ECHC, the ECCF, and the NCJ be strip-searched, regardless of the crime with which the detainee has been charged, and regardless of whether reasonable suspicion exists to believe the detainee has contraband on his or her person.[3] The Court eventually certified classes in both cases.

The Plaintiffs' claims in both cases are significantly impacted by the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 566 U.S. 318 (2012), which was decided during the pendency of these cases. In light of *Florence*, the *Erie* Plaintiffs acknowledge that their claims are no longer viable. They therefore seek to amend their complaint. In the alternative, the *Erie* Plaintiffs seek to decertify the class and to voluntarily dismiss their case. The *Erie* Defendants oppose each of these motions. Instead, the *Erie* Defendants seek summary judgment. In the *Niagara* action, both parties have moved for partial summary judgment, and the Plaintiffs have moved to amend.

_____

[3] The *Erie* action and the *Niagara* action are brought on behalf of different plaintiffs and are different in several material respects. Both cases, however, have been brought and defended by the same counsel; both cases raise identical procedural issues; and both cases turn on the same Fourth Amendment principles. The Court therefore addresses both cases together in this Decision and Order. When necessary, the parties in either case will be identified as the *Erie* Plaintiffs, the *Erie* Defendants, the *Niagara* Plaintiffs, or the *Niagara* Defendants.

For the reasons stated below, the Court denies the *Erie* Plaintiffs' motion to amend; decertifies the *Erie* class; denies the *Erie* Plaintiffs' motion to voluntarily dismiss this case; and grants the *Erie* Defendants' motion for summary judgment. In addition, the Court concludes that *Niagara* Plaintiff Dedrick Williams is no longer an adequate class representative; modifies the definition of the *Niagara* class to exclude detainees who were arrested as part of an unusual mass arrest on March 11, 2005; and defers ruling on the *Niagara* Plaintiffs' motion to amend and the parties' cross-motions for summary judgment. The Court will decide those motions once the parties address whether the *Niagara* class members should receive notice of their membership in the class.

## DISCUSSION

### A. Legal standards

#### a. The standard for summary judgment

The summary judgment standard is well settled. A party is entitled to summary judgment if the party shows "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, a court's role in deciding a summary judgment motion is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

When a party seeks summary judgment on a constitutional challenge to a prison policy—where, as discussed below, the law mandates a degree of deference to the judgment of prison officials—a court "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [a court's] inferences must accord deference to the views of prison authorities." *Beard v. Banks*, 548 U.S. 521, 530 (2006). "Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.*

### b. Standards for individual and municipal liability under § 1983

Both the *Erie* Plaintiffs and the *Niagara* Plaintiffs bring their claims under 42 U.S.C. § 1983. None of the Plaintiffs brings a claim against the sheriff's deputies who allegedly strip-searched them. Instead, each set of Plaintiffs brings their claims against, respectively, Erie and Niagara Counties, and against the supervisory officials in charge of the ECHC, the ECCF, and the NCJ. The Plaintiffs allege that the individual Defendants are responsible for implementing or enforcing unconstitutional strip-search policies. *See Erie* Docket No. 1 ¶ 13 (referring to individual Defendants as "Policy Making Defendants"); *Niagara* Docket No. 1 ¶ 9 (same). The standards for individual and municipal liability under § 1983 are different, and the Court therefore briefly addresses each standard.

## 1. Individual-capacity liability[4]

"In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).[5] Section 1983 does not allow government officials to "be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Instead, "[t]o establish a section 1983 claim" against a government official in his individual capacity, "'a plaintiff must establish a given defendant's personal involvement in the claimed violation.'" *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)). "A plaintiff may establish such personal involvement by making any one of five showings . . .:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

---

[4] Each of the individual Defendants is sued in both his official and individual capacities. "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) (citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)). *See also Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003) ("[A] suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent. Therefore, . . . it would be redundant to allow the suit to proceed against the City of Buffalo and the individual city officials in their official capacity.") (citations omitted). None of the individual Defendants moved to dismiss the official-capacity claims against them, but because those claims are duplicative of claims against Erie and Niagara Counties, they are, in effect, merged into the municipal-liability claims. Thus, the Court need not consider the Plaintiffs' official-capacity claims separately from the Plaintiffs' municipal-liability claims.

[5] There is no question whether the Defendants in both cases are "person[s]" acting "under color of state law" within the meaning of § 1983.

*Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[6]

## 2. Municipal liability

The principles governing liability for Erie and Niagara Counties are somewhat different than the principles governing liability for the individual Defendants. "A municipality may be liable under § 1983 only 'if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011) and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). A municipality, in other words, "cannot be held 'vicariously liable under § 1983 for [its] employees' actions.'" *Id.* (quoting *Connick*, 563 U.S. at 60) (quotation marks omitted). Rather, "to establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick*, 563 U.S. at 60).

## c. The Fourth Amendment as applied to prison strip searches

The Fourth Amendment prohibits "unreasonable searches and seizures." As its text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "The test of reasonableness under the Fourth Amendment," however, "is not capable of precise definition or mechanical application," and, "[i]n each case it requires a balancing of the need for the

---

[6] The Second Circuit has repeatedly declined to consider what impact, if any, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), had on the Second Circuit's decision in *Colon*. *See, e.g.*, *Shaw v. Prindle*, 661 F. App'x 16, 18 n.2 (2d Cir. 2016). Because neither party raises the issue, the Court assumes that *Colon* remains an accurate statement of the law in the Second Circuit.

particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).[7]

The context in which a Fourth Amendment "search" occurs helps inform the search's reasonableness. As a general matter, a court considering a Fourth Amendment claim must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* Searches of the sort at issue in these cases present two often countervailing considerations: Detention facilities are "unique place[s] fraught with serious security dangers," *id.*, but, at the same time, it is difficult to "underestimate the degree to which [such] searches may invade the personal privacy of inmates." *Id.* at 560. Balancing those considerations can be difficult, because while "inmates do not enjoy the full range of constitutional rights possessed by unincarcerated individuals, the Fourth Amendment still requires that searches—even those in the prison context—be reasonable." *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983) (citing *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

These principles underlie the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 566 U.S. 318 (2012). *Florence* involved a challenge to a jail policy requiring "strip searches" of all detainees, regardless of the seriousness of the detainee's alleged offense, and regardless of whether any reason existed to suspect that the detainee posed a danger or might be smuggling contraband.[8]

---

[7] Of course, subject to several "specific exception[s]," *Riley v. California*, 134 S. Ct. 2473, 2482 (2014), "reasonableness generally requires the obtaining of a judicial warrant." *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). No Plaintiff has suggested that a warrant is required for a non-contact prison strip search.

[8] The Court noted that the term "strip search" "is imprecise." *Id.* at 325. For instance, the term "may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or

The plaintiff in *Florence* was arrested based on a warrant that was later found to be invalid. After his arrest, the plaintiff was taken to a county detention center, where he was held for six days; he was then taken to a county correctional facility, after which he was released. Regulations at the first facility "required every arrestee to shower with a delousing agent," and "[o]fficers would check arrestees for scars, marks, gang tattoos, and contraband as they disrobed." *Id.* at 323. The plaintiff "claim[ed] he was also instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals." *Id.*

The second facility to which the plaintiff was taken had similar requirements. "[A]ll arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search." *Id.* at 324. "When they left the holding cell, they were instructed to remove their clothing while an officer looked for body markings, wounds, and contraband. Apparently without touching the detainees, an officer looked at their ears, nose, hair, scalp, fingers, hands, arms, armpits, and other body openings." *Id.* The Plaintiff also "allege[d] [that] he was required to lift his genitals, turn around, and cough in a squatting position as part of the process." *Id.* The plaintiff was then required to shower, after which he was allowed to enter the facility. *Id.* No corrections officer at either facility touched any part of the plaintiff's unclothed body. *Id.* at 325.

*Florence*'s analysis began by recognizing the "establish[ed]" principle that "correctional officers must be permitted to devise reasonable search policies to detect

---

more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position." *Id.* As used in *Florence*, however, the term "strip search" did "not include any touching of unclothed areas by the inspecting officer." *Id.*

and deter the possession of contraband in their facilities." *Id.* at 328. Moreover, the Court observed, "[t]he task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials.'" *Id.* (quoting *Bell*, 441 U.S. at 548). Thus, the bottom-line rule from the Court's prison-search cases is that "deference must be given to the officials in charge of a jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.* at 330 (quoting *Block v. Rutherford*, 468 U.S. 576, 584-85 (1984)).

In light of these principles, the Court rejected the plaintiff's argument that "more invasive search procedures" were unconstitutional as applied to detainees who were held for less-serious offenses, and for whom there was no "reasonable suspicion of a concealed weapon or other contraband." *Id.* The Court began by observing that "[t]he admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself." *Id.* These risks include the introduction of lice or contagious infections, the risk "posed by the increasing number of gang members who go through the intake process," and the "most serious responsibility" of "[d]etecting contraband concealed by new detainees." *Id.* at 331-32. Providing anecdotal evidence of the problem of prison contraband—even from the most benign items, such as chewing gun or a pen case[9]—and observing that it "often takes little time and effort" to conceal contraband, the Court concluded that "[i]t is not surprising that correctional officials have sought to perform thorough searches at intake." *Id.* at 333.

---

[9] "Chewing gum can block locking devices," while "an overlooked pen case can pose a significant danger": "Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves." *Id.* at 332-33 (quotation marks omitted).

With these considerations in mind, the Court observed that "[t]he record" in *Florence* provided "evidence that the seriousness of an offense is a poor predictor of who has contraband," and the record also demonstrated "that it would be difficult in practice to determine whether individual detainees fall within" the plaintiff's "proposed exemption" for detainees who had been arrested for less serious crimes. *Id.* at 334. This was true for several reasons: First, "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals." *Id.* at 334-35 (providing anecdotal examples). Second, "[e]xperience shows that people arrested for minor offenses have tried to smuggle prohibited items into jail, sometimes by using their rectal cavities or genitals for the concealment." *Id.* at 335. Third, "[e]ven if people arrested for a minor offense do not themselves wish to introduce contraband into a jail, they may be coerced into doing so by others"—"for example, [if] a person arrested and detained for unpaid traffic citations is not subject to the same search as others, this will be well known to other detainees with jail experience." *Id.* at 336. And fourth, "[i]t . . . may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search." *Id.* Intake officials "would be required, in a few minutes, to determine"—on pain of possible liability, "or even . . . charges of discriminatory application"—"whether any of the underlying offenses were serious enough to authorize the more invasive search protocol." *Id.* at 337.

Thus, *Florence* held that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id.* at 322-33. Doing so in *Florence* meant that "every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." *Id.* at 322.

*Florence* emphasized, however, that its holding does not apply to every conceivable prison strip search. Specifically, the Court noted that it was not asked "to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338-39. The Court also noted that it was not asked to consider the case of "an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population." *Id.* at 339. *See also id.* at 340 (Roberts, C.J., concurring) ("[I]t is important for me that the Court does not foreclose the possibility of an exception to the rule it announces. Justice Kennedy['s majority opinion] explains that the circumstances before it do not afford an opportunity consider that possibility."); *id.* (Alito, J., concurring) ("join[ing] the opinion of the Court but emphasiz[ing] the limits of [its] holding"); *In re Nassau Cnty. Strip Search Cases*, 639 F. App'x 746, 750-51 (2d Cir. 2016) ("[T]he Supreme Court [in *Florence*] indicated that categorically strip-searching the following two classes of detainees may not pass constitutional muster: (1) detainees charged with misdemeanors and segregated *alone* from the general population; and (2) detainees charged with misdemeanors and segregated *with other detainees charged with misdemeanors* from the general population.") (emphasis in original).

\* \* \*

With these background principles in mind, the Court now addresses the pending motions in the *Erie* action and the *Niagara* action.

### B. The *Erie* action (04-CV-534)

The *Erie* action is, procedurally, more complex than the *Niagara* action. The *Erie* Defendants, as noted, have moved for summary judgment. Rather than opposing that motion, however, the *Erie* Plaintiffs filed several motions of their own. First, the *Erie* Plaintiffs moved to amend their complaint, seeking (1) to allege that a purported policy of *group* strip searches violates the Fourth Amendment, even after *Florence*; and (2) to bring a claim under the New York State Constitution. *See* Docket No. 303-9. After the *Erie* Defendants responded to that motion, the *Erie* Plaintiffs moved (1) for an order decertifying the *Erie* class; and (2) for an order voluntarily dismissing this case pursuant to Federal Rule of Civil Procedure 41(a)(2). In their motion to decertify and for voluntarily dismiss, the *Erie* Plaintiffs "acknowledge that they cannot assert claims under the Federal constitution under *Florence* for the searches they endured." Docket No. 315-1 ¶ 4. The Court addresses each motion in turn.

#### a. The *Erie* Plaintiffs' motion to amend

The *Erie* Plaintiffs first move to amend their complaint to add (1) a Fourth Amendment claim based on an alleged "group" strip search policy; and (2) a claim under the New York State Constitution. The *Erie* Defendants oppose this motion.

Federal Rule of Civil Procedure 15(a)(2) provides that, as applicable here, a party "may amend its pleading only with . . . the court's leave. The court should freely give leave when justice so requires." It is well settled that this is a "permissive standard," intended to promote the "strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quotation marks omitted). But this does not mean that "every request to amend must be granted." *Panther Partners Inc. v.*

*Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620 (2d Cir. 2009). Among the "grounds to deny leave to amend [are] 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The *Erie* Defendants argue that leave to amend should be denied because (1) the proposed new claims would be futile; (2) the *Erie* Plaintiffs waited too long to seek leave to amend; and (3) the *Erie* Defendants would suffer "substantial prejudice" if leave to amend were granted. Docket No. 305 at 12. The Court offers no opinion on whether the Plaintiffs' proposed amendments would be futile, particularly in light of the fact that the *Erie* Plaintiffs' proposed state law claim raises apparently novel issues of New York constitutional law, over which the Court would likely decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(1).

The Court instead denies the *Erie* Plaintiffs' motion to amend because the Plaintiffs waited too long to file the motion, and because the *Erie* Defendants would be unduly prejudiced by the proposed eve-of-judgment amendment. A court "plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).

This case was filed in 2004. The *Erie* Defendants represent—and the *Erie* Plaintiffs do not dispute[10]—that "[a]ll of the thirty-three depositions in this case were

---

[10] The Court's scheduling order (Docket No. 300) provided that the *Erie* Plaintiffs "may reply to Defendants' response" to the Plaintiffs' motion to amend. The *Erie* Plaintiffs did not file any response.

completed by December 2006." Docket No. 305 at 18. The Court raised the issue of *Florence* with the parties in 2011.[11] The record does not show that the *Erie* Plaintiffs sought to raise group-search or state-law claims at any time during the seven-year period between when the complaint was filed and when the Court stayed this case in anticipation of *Florence*. To be sure, the *Erie* Plaintiffs' proposed group-search claims likely did not take on particular resonance until *Florence* largely foreclosed individual-search claims. But the *Erie* Plaintiffs offer no reason why they could not have raised group-search claims or state-law claims prior to *Florence*. Those claims were as available fourteen years ago (when this case was filed) as they were seven years ago (when the Court stayed this case in light of *Florence*). And because those claims were available well before *Florence*, the *Erie* Plaintiffs have not offered a sufficient reason to excuse their delay in moving to amend. *Cf. Cresswell*, 922 F.2d at 72 (observing that, in considering a late-filed motion to amend, "the court is free to conclude that ignorance of the law is an unsatisfactory excuse").

This unexplained delay also caused at least some prejudice to the *Erie* Defendants. *See State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."); *Evans v. Syracuse City School Dist.*, 704 F.2d 44, 47 (2d Cir. 1983) ("[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.")

---

[11] In deciding that the *Erie* Plaintiffs' motion to amend was unduly delayed, the Court does not consider the period of time that has passed since *Florence* was decided. The *Erie* Plaintiffs proposed amending their complaint following *Florence*, but the Court did not act on the Plaintiffs' proposal. Although the *Erie* Plaintiffs did not seek any action from the Court during the intervening period—or simply move to amend—the Court also shares some of the blame for failing to manage this case more aggressively.

(quotation marks omitted). The *Erie* Defendants assert—quite reasonably—that group-search claims were "never a focus of discovery," and that, at this late stage, "all but one of the named individual defendants . . . are either retired or have moved on to other endeavors." Docket No. 305 at 20. Moreover, there is obvious prejudice in asking witnesses to recall events that occurred, at the most recent, nearly fourteen years ago.

The *Erie* Plaintiffs attempt to downplay this prejudice, pointing to evidence from discovery suggesting that at least some detainees were subjected to group strip searches. But even if this is true, it does not mitigate the prejudice to the *Erie* Defendants. The Fourth Amendment question in this case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The Fourth Amendment question is, therefore, very fact dependent, and no matter the theory of liability, it cannot be answered solely on the basis of testimony from the individual Plaintiffs or other class members. To take one example, the *Erie* Defendants may have focused their discovery on different issues if they anticipated having to argue that group strip searches *and* individual strip searches were reasonable under the Fourth Amendment.

Given the *Erie* Plaintiffs' delay in seeking to add group-search and state-law claims, the *Erie* Defendants have shown sufficient prejudice such that the Plaintiffs' motion to amend should be denied. Thus, the *Erie* Plaintiffs' motion to amend is denied.

### b. The Plaintiffs' motion to decertify the class

The *Erie* Plaintiffs next move to decertify the class. The Court previously granted the *Erie* Plaintiffs' motion for class certification and certified a class pursuant to Federal

Rule of Civil Procedure 23(b)(3). *See* Docket No. 264. Specifically, the Court certified the following class:

> All persons who have been placed into the custody of the Erie County Correctional Facility and/or the Erie County Holding Center after being charged with misdemeanors, violations, violations of probation or parole, traffic infractions, civil commitments or other minor crimes and were strip searched upon their entry into the Erie County Correctional Facility and/or the Erie County Holding Center pursuant to the policy, custom, and practice of the Erie County Sheriff's Department and the County of Erie. The class period commences on July 22, 2001 and extends until May 1, 2004. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.[12]

The *Erie* Plaintiffs, as noted, have moved to decertify the class. Rule 23(c)(1)(C) provides that "[a]n order that grants . . . class certification may be altered or amended before final judgment." The obvious effect of decertification "is to allow the absent class members to avoid being bound by the decision [on the merits]." 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1785.4, at 487 (3d ed. 2005) (hereinafter "Wright & Miller"). The resulting inequity is equally obvious: "If the class has lost on the merits, this result may be inappropriate when the opponent has devoted the time and resources necessary to defend a class suit and now finds that only the named plaintiffs are bound and the same issues may have to be retried." *Id.*

Despite the possible inequities of decertification, the Court has "'an affirmative obligation to ensure' that class certification remains appropriate throughout the litigation." *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 42 (W.D.N.Y. 2009) (quoting *Wu v. MAMSI*

---

[12] The Court also certified two subclasses: one for class members "who were placed in the custody of the Erie County Holding Center during the class period," and a second for class members "who were placed in the Erie County Correctional Facility during the class period." *Id.* at 13-14.

*Life & Health Ins. Co.*, 256 F.R.D. 158, 162-63 (D. Md. 2008)). This is because a judgment in a class action binds absent class members. Fed. R. Civ. P. 23(c)(3). Courts are therefore "'required to reassess their class rulings as the case develops.'" *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (quotation marks omitted). *See also Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (observing that a district court has the "affirmative duty of monitoring its class decisions in light of the evidentiary development of the case") (quotation marks omitted).

The fundamental question a court must answer when deciding a decertification motion is whether, in light of post-certification events—such as changes in the law or facts underlying a decision to certify a class—"'it appears that the requirements of Rule 23 are not in fact met.'" *Id.* (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)). Thus, an intervening change in the law provides a basis to decertify when, had the law been different at the time of certification, certification would not have been appropriate. *See Doe v. Karadzic*, 192 F.R.D. 133, 136 (S.D.N.Y. 2000) (decertifying class where intervening Supreme Court case law "provide[d] the Court with a new starting point for determining the appropriateness of class certification"). In other words, a change in the law governing the *merits* of a class action is not necessarily a sufficient reason to decertify a class; rather, a change in the law must affect whether certification remains proper in light of the requirements of Rule 23.

The *Erie* Plaintiffs do not explain how *Florence* affects the Court's class certification order: that is, they do not show how *Florence* affects the Court's consideration of any of Rule 23(a)'s class-certification prerequisites, nor do they show how *Florence* changes the Court's analysis under Rule 23(b)(3). Rather, they merely assert that

decertification is appropriate "[g]iven this change in the law, and the fact that notice was not sent to the class given the pendency and aftermath of the *Florence* decision." Docket No. 315-1 ¶ 4. But *Florence* does not appear to affect the class's numerosity, commonality, typicality, or the adequacy of the class's representation. *See* Fed. R. Civ. P. 23(a). Likewise, *Florence* has no apparent bearing on whether "questions of law or fact common to class members predominate over any questions affecting only individual members," nor does it change whether "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Instead, *Florence* simply means that the entire *Erie* class—rather than just the named *Erie* Plaintiffs—are likely to lose on the merits. The *Erie* Plaintiffs have not provided authority for the proposition that the likelihood of success on the merits has any relevance to a decision to certify (or, as here, decertify) a class.[13]

The Court, however, must be cognizant of the fact that, if it does not decertify the class, judgment will be entered against the entire class, Fed. R. Civ. P. 23(c)(3), and that judgment could have *res judicata* effect that the Court cannot predetermine. *See* Advisory Committee Note (ACN) to 1966 Amendment to Rule 23(c)(3) ("[S]ubdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action."); 7AA Wright & Miller § 1789, at 553-554 ("It is well settled that the court adjudicating a dispute cannot predetermine the binding effect of its own judgment;

---

[13] Indeed, it is unclear whether a court can decertify a class or modify a certification order for reasons other than a failure to comply with Rule 23. *See* 7AA Wright & Miller § 1785.4, at 481-82 ("The reasons given by the courts for altering certification orders are similarly diffuse and have included lack of numerosity, lack of commonality, the inadequacy of the named plaintiffs as class representatives, inadequacy of counsel and a lack of manageability.") (footnotes omitted).

that can be tested only in a subsequent suit.")  The problems this presents are heightened in this case because—despite this case's vintage—class members have not yet received notice of their membership in the class.  As a result, a decision not to decertify the class would possibly extinguish any claims the absent class members might have—under a group-search Fourth Amendment theory, under State law, or otherwise—and it would do so without ever giving those class members notice that their potential claims had been extinguished.

The result is an obvious due process problem.  Rule 23(c)(2) requires notice for a Rule 23(b)(3) class.  That requirement is "'not . . . discretionary'"—indeed, it "'is designed to fulfill requirements of due process to which the class action procedure is of course subject.'"  *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 173 (1974) (quotation marks omitted).  *See also* 7AA Wright & Miller § 1786, at 492-95 ("Without [Rule 23(c)(2)'s] notice requirement it would be constitutionally impermissible to give the judgment binding effect against the absent class members. . . .  In light of [*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) and other cases] it seems clear that effective notice must be provided in a Rule 23(b)(3) action as a prerequisite to binding the absent members of the class.")

Given the serious due process concerns raised by entering judgment against a certified Rule 23(b)(3) class whose members have not received notice, the Court decertifies the *Erie* class.  Of course, the Court's concern about entering judgment against the class may ultimately end up being academic: Although the class is quite large— potentially including 30,000 detainees, Docket No. 264 at 6—it is also limited to those people who were detained at any time during a roughly three-year period that ended on

May 1, 2004.  Thus, it is possible that the former class members' claims may largely be time-barred.[14]  But the Court is not in a position to evaluate the practical effects that decertification would have on absent class members.  Those questions must be answered, if ever, in a subsequent action.  The Court's concern at this time is simply whether the Due Process Clause allows the Court to enter judgment against a class whose members have not received the notice required by Rule 23(c)(2).  Because the answer to that question is "no," the Court grants the *Erie* Plaintiffs' motion to decertify.[15]  This case will therefore proceed only as to Plaintiffs Adam Pritchard and Edward Robinson in their individual capacities.[16]

### c.  The *Erie* Plaintiffs' motion to voluntarily dismiss this case

Instead of opposing the *Erie* Defendants' summary judgment motion, the *Erie* Plaintiffs move to voluntarily dismiss their case pursuant to Rule 41(a)(2).  That Rule provides that, except in circumstances not present here, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."  The *Erie* Plaintiffs seek voluntary dismissal because, they claim, they have "well-founded and compelling claims against Erie County under the New York State Constitution," which

---

[14]  The Court offers no opinion on this question.

[15]  "[N]otice of decertification is required only to the extent necessary to reach those potential class members who received notice of certification and relied on being included in the class."  *Hervey v. City of Little Rock*, 787 F.2d 1223, 1230 (8th Cir. 1986).  Because the class members in this case have not received notice of their membership in the class, the Court does not believe that it is necessary to notify the class members that the class has been decertified.  *Cf. Daisy Mountain Fire Dist. v. Microsoft Corp.*, 547 F. Supp. 2d 475, 486 (D. Md. 2008) (noting that state rule, which was substantively identical to Fed. R. Civ. P. 23(c)(2), is "concerned with ensuring that class members' individual claims are not later barred by *res judicata* without having first notified them of this danger," rather than with ensuring that class members have notice of "when class action tolling ended").  *But see Barnett v. Experian Information Solutions, Inc.*, 236 F.R.D. 307, 308 (E.D. Tex. 2006) (ordering notice of decertification even though "there is no indication that any absent class member is even aware of these proceedings").

[16]  All future references to "the *Erie* Plaintiffs" in this Decision and Order will refer only to Plaintiffs Pritchard and Robinson.

they intend to bring in state court, and which they hope to have "relate back to the date of the original filing of this class action." *Erie* Docket No. 315-1 ¶ 6.

Whether to grant a Rule 41(a)(2) motion to dismiss "is within the district court's sound discretion." *Cantanzano v. Wing*, 277 F.3d 99, 109 (2d Cir. 2001). "Generally, . . . a voluntary dismissal without prejudice under Rule 41(a)(2) will be allowed if the defendant will not be prejudiced thereby." *Id.* (quotation marks omitted). In deciding whether to grant a Rule 41(a)(2) motion, a court should consider:

> [1] the plaintiff's diligence in bringing the motion; [2] any undue vexatiousness on plaintiff's part; [3] the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; [4] the duplicative expense of relitigation; and [5] the adequacy of plaintiff's explanation for the need to dismiss.

*Id.* at 110 (quoting *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990)).

The first and third factors weigh strongly in favor of denying the *Erie* Plaintiffs' motion. The Supreme Court decided *Florence* in April 2012, but the *Erie* Plaintiffs waited to file their motion for voluntary dismissal—in which they admit that *Florence* forecloses their federal law claims—until five years later. In other words, at no time during this period did the *Erie* Plaintiffs seek to voluntarily dismiss what they now acknowledge are almost certainly losing claims. This factor weighs heavily in favor of denying the motion.

To be sure, the "duplicative expense of relitigation," *id.*, would likely not be enormous, given that most, if not all, of the discovery obtained from this case could likely be used in a state case. And the fact that the *Erie* Plaintiffs seek to dismiss this case so that they may bring a separate, somewhat overlapping state case is a neutral factor— "[t]he mere prospect of a second lawsuit or some tactical disadvantage is not sufficient legal prejudice to prevent a Rule 41(a)(2) dismissal." *Jaskot v. Brown*, 167 F.R.D. 372,

373 (S.D.N.Y. 1996). In other words, although the *Erie* Defendants would be prejudiced by a voluntary dismissal, that prejudice would not be severe.

Nonetheless, the *Erie* Plaintiffs offer no explanation for their lengthy delay in seeking voluntary dismissal. To be sure, the Court should have managed this case more aggressively following *Florence*; doing so may have resulted in a more timely motion for voluntary dismissal. But the *Erie* Plaintiffs still waited an inordinate amount of time to file their motion, going so far as to allow the *Erie* Defendants to file a motion for summary judgment before moving to dismiss. The evidence on which the *Erie* Defendants' summary judgment motion is based was surely also available to the *Erie* Plaintiffs for the past five years. In other words, the basis for the *Erie* Plaintiffs' motion—that is, the likely futility of continuing their federal law claims—has been available for half-a-decade. The *Erie* Plaintiffs' failure to move for voluntary dismissal during this time frame is dispositive of their motion. The *Erie* Plaintiffs' motion for voluntary dismissal is therefore denied.

### d. The *Erie* Defendants' motion for summary judgment

The Court now addresses the *Erie* Defendants' motion for summary judgment.

### 1. The effect of the *Erie* Plaintiffs' failure to oppose the *Erie* Defendants' motion for summary judgment

The *Erie* Plaintiffs acknowledge that, in light of *Florence*, "they cannot assert claims under the Federal constitution . . . for the searches they endured." Docket No. 315-1 ¶ 4. Thus, the *Erie* Plaintiffs do not oppose the *Erie* Defendants' summary judgment motion. The Court may not, however, grant a motion for summary judgment simply because it is unopposed. *See Vermont Teddy Bear Co., Inc. v. 1-800-Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district

court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.")

But the *Erie* Plaintiffs' failure to oppose the *Erie* Defendants' motion for summary judgment *does* mean that the Court may consider the *Erie* Defendants' Statement of Material Facts to be "undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). *See also* L.R. Civ. P. 56(a)(2) ("Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.") Given the *Erie* Plaintiffs' ample opportunity to oppose the *Erie* Defendants' summary judgment motion; the *Erie* Plaintiffs' decision to respond to the *Erie* Defendants' summary judgment motion with a motion to amend and a motion to decertify; and the *Erie* Plaintiffs' acknowledgement that their claims cannot survive *Florence*, the Court will deem the *Erie* Defendants' Statement of Material Facts, where supported by the record, undisputed *only* "for purposes of th[is] [summary judgment] motion." *Id.* *See* 2010 ACN to Rule 56(e) ("The fact is considered undisputed only for purposes of the motion."); *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 582 (W.D.N.Y. 2015) ("The Court is cognizant that it has discretion to excuse a party's failure to file a statement of facts, and the Second Circuit Court of Appeals has indicated that a district court should not deem unopposed facts to [b]e admitted when those facts are unsupported by the record.") (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001)).

## 2. Undisputed facts relevant to the *Erie* Defendants' motion for summary judgment

Erie County operates two facilities that are at issue in this case: the Erie County Correctional Facility (ECCF) and the Erie County Holding Center (ECHC). The ECHC "is

a traditional holding center or lockup," which "served as the principle intake point for individuals arrested by the Erie County Sheriff, the City of Buffalo Police, and other police agencies" throughout Erie County. *Erie* Docket No. 301-1 (*Erie* Statement of Material Facts (SMF)) ¶ 17. Part of the ECHC is also used as a jail for sentenced inmates. *Id.* In contrast, the ECCF is "a traditional correctional facility or 'jail,'" at which inmates are housed after they begin serving a period of incarceration. *Id.* ¶ 16. The ECCF may, however, also house "overflow prisoners from the ECHC," who are transferred to the ECCF "after being processe[d] and housed at the ECHC." *Id.* ¶ 18.

By January 1997, a revised search strip-search policy became effective at the ECHC. *See Erie* Docket No. 301-5.[17] As relevant to this case, the policy provided a lengthy explanation of when, and why, strip searches were permitted or required. Because it is central to the issues in this case, the Court recites the relevant parts of the policy in full. (All underlining and typographical errors are contained in the original policy.)

<u>IMPORTANT</u>:

Due to a decision handed down from the New York State of Appeals [sic], (Dell v. Weber), regarding strip searches, the following procedure(s) will be followed:

Those <u>arraigned</u> individuals booked in the facility on a <u>violation</u> or <u>misdemeanor charge will not be strip-searched</u> unless a <u>*reasonable</u>, <u>justifiable</u> suspicion exists that this individual may be secreting contraband on their person. If this suspicion exists, this individual will be secured in an Isolation Unit in Booking and the <u>Supervisor will be notified</u>. It will then be the responsibility of the Supervisor to determine whether this reasonable suspicion warrants a strip-search. any such decisions to strip-search will be thoroughly documented in the Booking and Supervisor/s Log Books and an informational

---

[17] The policy filed as part of the *Erie* Defendants' summary judgment motion states that the policy became effective in April 1986 and was revised in April 1991 and January 1997. The policy does not state, however, what changes were made at those times.

sheet, outlining the search and the reasons for authorizing same, will be forwarded to the Superintendent's Ofc.

* Reasonable suspicion will include the circumstances of the individual's crime (drug raid, weapons' possession); the individual's prior criminal history (weapons or drug charges), if known, the individual's behavior (violent/assaultive or threatening); or the individual's overt possession of drugs or weapons. <u>All arraigned inmates booked into the facility on felony charges will be strip-searched</u>.

All arraigned individuals booked into the facility will be required to be showered and changed into facility issued clothing consistent with facility health requirements. <u>If the above criteria is not present to warrant a strip-search, care must be taken to ensure that his inmate's privacy interests are not violated.</u>

Strip searches are <u>mandatory</u> at the following times and will be conducted in an area which will ensure the privacy of the inmate being searched:
1. Upon admission for those arraigned inmates charged with a felony.
2. After a contact visit. This strip-search will be conducted in the Search Rooms adjacent to the visiting room.
3. After an inmate's return to the facility from the outside, i.e., Court, hospital, clinic, etc.
4. If an inmate is leaving on a long distance trip to another facility, the Transporting Deputies will conduct a strip search prior to leaving the facility.
5. At any time a Supervisor feels that this type of search is warranted during a shakedown instead of a pat search.

*Id.* at 5-6.

The policy defined a "strip search" as "a search during which an inmate is required to remove his/her clothing." *Id.* at 2. The policy then instructed sheriff's deputies on how to conduct a strip search, but the policy made clear that a "strip search" did not include a body cavity search. *Id.* at 6-7.[18]

---

[18] Rather, the policy provided that a "[b]ody cavity search may be authorized <u>only in circumstances where there are compelling reasons</u> to believe that an inmate or inmates to be searched have secreted in a body cavity contraband the nature of which constitutes a clear threat to the safety and security of the facility and/or persons therein." *Id.* at 7. The policy further required that a body cavity search would be performed

An almost identically-worded policy became effective at the ECCF by October 2002.[19] *Erie* Docket No. 301-6. Thus, by January 1997, policy at the ECHC prohibited strip searches (absent reasonable suspicion) for those arraigned on violations, misdemeanors, or other minor crimes, and by October 2002, policy at the ECCF was the same. By contrast, all newly-arriving detainees charged with a felony were strip-searched, and strip searches were required when, for instance, an inmate left and returned to a facility.

Policy at both the ECHC and the ECCF changed again in September 2003. *See Erie* Docket No. 301-7. This new policy limited the use of strip searches even further: It stated that "strip searches shall not be performed on inmates, except as prescribed [in another section of the policy], or where ***Individualized Reasonable Suspicion*** exists that the inmate possessed contraband." *Id.* at 11 (emphasis in original). The September 2003 policy contained largely the same exceptions as those contained in the previous policy, with the primary difference being that the September 2003 policy did *not* require strip searches for those arraigned on felony charges. *Id.*[20] Finally, the 2003 policy

---

(1) only with "<u>THE EXPLICIT AUTHORITY OF THE SUPERINTENDENT</u>"; (2) "<u>PURSUANT TO A COURT ORDER</u>"; and (3) at a hospital by a "QUALIFIED PHYSICIAN." *Id.* (emphases in original).

[19] The policy filed as part of the *Erie* Defendants' summary judgment motion states that it was updated in April 1991, in January 1997 (when the ECHC policy was updated), and in October 2002. The *Erie* Defendants' Statement of Material Facts states that the ECCF policy was the same as the ECHC policy "by January 1997, at the latest." SMF ¶ 25. The ECCF policy, however, does not support this claim, because the policy does not show what changes were made to the policy in 1991,1997, and 2002. Although it may be reasonable to infer that the Erie County Sherriff's Department made identical changes to both facilities' policies at the same time, the record does not clearly support such a conclusion. Because the summary-judgment standard requires the Court to view the evidence in the light most favorable to the *Erie* Plaintiffs, the Court cannot, for purposes of this motion, credit the *Erie* Defendants' claim that strip-search policies at both facilities were identical by January 1997.

[20] The new policy contained several other exceptions. It required strip searches: (1) "[p]rior to administrative or disciplinary segregation"; (2) "[u]pon recapture following escape or absconding"; (3) "[p]rior to admission to constant supervision pursuant" to a suicide prevention plan; (4) "[d]uring scheduled area searches (shakedowns) or any other area search, when strip searches are ordered by a supervisor"; and

expanded the criteria to be considered when deciding whether reasonable suspicion existed for a strip search,[21] and the new policy imposed additional reporting and review requirements before a reasonable suspicion-based strip search could be conducted. *Id.*

In the face of these policies, the *Erie* Plaintiffs identify eight people who testified that they were subjected to, witnessed, or conducted strip searches.[22] Those people are the remaining individual Plaintiffs—Adam Pritchard and Edward Robinson—four other former detainees, and two former Erie County Sheriff's Deputies. Because the *Erie* Plaintiffs did not file an opposition to the Defendants' motion for summary judgment, and because the Court has considered the *Erie* Defendants' Statement of Material Facts undisputed for purposes of this motion, the Court's decision is based solely on the facts contained in the Defendants' Statement of Material Facts. In other words, if discovery revealed any further evidence of strip searches consistent with the evidence that the *Erie* Defendants identify, the Court has not considered that evidence when deciding this motion.

---

(5) "[f]ollowing any major incident or disturbance involving violence, weapons, hostages, narcotics, escape, absconding, or following any other incident when strip searches are ordered by a supervisor." *Id.*

The *Erie* Defendants' Statement of Material Facts does not suggest that the *Erie* Plaintiffs were strip searched at any time other than when they were admitted to the ECHC or the ECCF. Thus, the Court offers no opinion on the constitutionality of strip searches conducted pursuant to one of the exceptions to the ECHC and ECCF's general no-strip-search policy.

[21] For instance, reasonable suspicion could be supported by a deputy's observations, by a detainee's "[k]nown institutional history of possessing contraband," and or by "[i]nformation received from co-defendants other inmates [sic] in the immediate proximity." *Id.* at 11-12.

[22] At several points in their motion, the *Erie* Defendants attack the credibility of, or attempt to impeach, the individuals who testified consistently with the *Erie* Plaintiffs' theory of the case. *See, e.g.*, *Erie* SMF ¶ 56 ("Adam Pritchard is a career felony criminal whose extensive rap sheet includes violent crimes such as assault and sexual abuse."); *id.* ¶ 59 ("Edward Robinson has also had several run ins with the law, has been arrested numerous times, and was remanded to the ECHC on several occasions."); Docket No. 301-29 at 8 (arguing that two sheriff's deputies who testified on the Plaintiffs' behalf "were poor employees with multiple issues that ultimately led to resignation/termination"). It is black-letter law, of course, that a court may not weigh a witness's credibility on a summary judgment motion.

As noted, the *Erie* Defendants identify eight people who might support the *Erie* Plaintiffs' claims. First, one of the individual *Erie* Plaintiffs, Adam Pritchard, claimed that, after being remanded to the ECCF for a parole violation, he was directed to remove his clothing, "lift his genitals, bend over and spread his buttocks, and then place his hands on the wall and expose the soles of each foot." *Erie* SMF ¶¶ 57-58. The other *Erie* Plaintiff, Edward Robinson, claimed that he was subjected to a similar search. *Id.* ¶¶ 61-63. Likewise, the *Erie* Plaintiffs identify two former Erie County Sheriff's Deputies who described a strip-search procedure similar to that described by the *Erie* Plaintiffs. *Id.* ¶ 67. Both of these former deputies, however, had limited involvement in jail intake (where searches would be performed). *Id.* ¶¶ 66, 73-74.

Finally, the Plaintiffs identify four other detainees who testified that they were strip searched. One detainee testified that a deputy "put his hand vertical and pushed it right in my crack, the buttocks, all the way in, and then he took his forefinger and thumb and reached in and pulled the underwear out." *Id.* ¶ 79. Another detainee testified that he was subjected to a less invasive search that was similar to the searches described by *Erie* Plaintiffs Pritchard and Robinson. *Id.* ¶ 80. The next detainee testified that she was strip searched in a room with a group of other women. According to her testimony, one woman "had to remove her feminine product and throw it on the floor," and each of the women was required to bend over, cough, and have her hair searched. *Id.* ¶ 81. Finally, another detainee testified that he was subjected to a strip search, together with five or six other men, that required him "to step up to [a] line, bend over, and perform other tasks so that the guard could check him." *Id.* ¶ 82.

The evidence described above, viewed in the light most favorable to the Plaintiffs, is insufficient to support a § 1983 claim against Erie County or the individual Defendants in their official capacities. As an initial matter, the evidence—even when viewed entirely in the *Erie* Plaintiffs' favor—shows that the *Erie* Defendants did not have an official policy, during the time period when the *Erie* Plaintiffs were strip searched, of strip-searching new detainees charged with misdemeanors, violations, and other minor crimes. To the contrary, the record shows that the *Erie* Defendants had a policy *prohibiting* such searches as a matter of course, and permitting them only in limited circumstances.[23]

Thus, to defeat the *Erie* Defendants' summary judgment motion, the *Erie* Plaintiffs must rely on several isolated claims of strip searches. When this evidence is viewed in the light most favorable to the Plaintiffs, the evidence shows only that several sheriff's deputies conducted strip searches, and that they did so—possibly—in contravention of policy prohibiting such searches. Because this is the *Erie* Plaintiffs' only viable theory of liability, it is important to remember the identities of the *Erie* Defendants: The Plaintiffs have not sued the sheriff's deputies who they claim strip searched them; they have instead sued Erie County and several supervisory officials.[24]

---

[23] As noted at note 19, the record does not support the *Erie* Defendants' claim that, by January 1997, policy at the ECCF prohibited strip searches of detainees arrested for minor offenses. This issue, however, is immaterial to the Court's resolution of the *Erie* Defendants' summary judgment motion. Plaintiff Pritchard testified that he was strip searched at the ECCF on May 13, 2003, *see* Docket No. 301-19 at 10—that is, at a time when it is undisputed that ECCF policy prohibited strip searches for non-felony detainees. Plaintiff Robinson, by contrast, testified that he was strip searched at the ECHC, where, the record shows, policy prohibited intake strip searches during the time at issue.

[24] The *Erie* Defendants argue that judgment should be entered in their favor because, even assuming that the searches were conducted as alleged, the searches "fall directly within the ambit of what the Supreme Court held was permissible under *Florence*." That claim, however, is only true as to some of the individuals who allege that they were strip searched. *Florence* took care to note that "[t]here [were] no allegations that the detainees [in *Florence*] were touched in any way as part of the searches." 566 U.S. at 325; *id.* at 339 (while describing the limits of *Florence*'s holding, noting that "[t]here also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees"). By contrast, the *Erie* Defendants identify several individuals who allege that sheriff's deputies *did* touch them—in one instance, quite

As to Erie County and the individual *Erie* Defendants in their official capacities, summary judgment must be granted in favor of the Defendants.  As noted, during the time period at issue, Erie County Sheriff's Department policy prohibited intake strip searches for all but felony detainees (absent reasonable suspicion), and it later prohibited *all* intake strip searches (again, absent reasonable suspicion).  The record contains evidence—assumed to be true for purposes of this motion—that at least some sheriff's deputies conducted strip searches in violation of this policy.  But even with this evidence, and based on the limited factual record before the Court, municipal liability may not attach to Erie County or the individual Defendants in their official capacities.

In the ordinary case, "municipal liability 'under Section 1983 does not arise out of the allegedly unconstitutional acts of an employee that are *contrary* to a municipality's alleged policy.'"  *Maldonado v. Schriro*, 15 Civ. 3409 (PAE), 2017 WL 2633578, at *2 (S.D.N.Y. June 16, 2017) (quoting *Zargary v. City of New York*, No. 00 Civ. 897 (RJH), 2010 WL 329959, at *2 (S.D.N.Y. Jan. 26, 2010)) (emphasis in *Maldonado*).[25]  Although there may be cases where an employee's (or, more likely, employees') unconstitutional

---

invasively—as part of a strip search.  *See, e.g., Erie* SMF ¶¶ 63 (Plaintiff Robinson), 79 (another detainee).  The limits of *Florence*'s holding, combined with these allegations, make it difficult to resolve the *Erie* Defendants' summary judgment motion by simply holding that these allegations, even if true, are legal under *Florence*.  Thus, by granting summary judgment for the *Erie* Defendants, the Court does not suggest any opinion on whether the strip-search allegations made by each person identified in the *Erie* Defendants' Statement of Material Facts, if true, are constitutional after *Florence*.

[25]  *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989) (observing that, where a municipality has a policy that is constitutional, "without more," the municipality would not "automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*"); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."); *Sullivan v. City of New York*, 690 F. App'x 63, 67 (2d Cir. 2017) ("[Plaintiff] provides insufficient evidence that any alleged violation resulted from a policy or custom.  In fact, [plaintiff] himself undermines his allegations of a policy or custom by contending that the arresting officers acted 'contrary to the policy of the NYPD regarding potential domestic violence matters' when they arrested him.") (citation omitted).

actions can give rise to municipal liability despite the existence of a valid municipal policy, the record in this case, even when viewed in the light most favorable to the Plaintiffs, does not support such a claim. Instead, the most that the evidence shows is that several sheriff's deputies acted contrary to municipal policy. Thus, summary judgment must be granted to Erie County and the individual Defendants in their official capacities.[26]

As to the individual Defendants in their individual capacity, the question is whether the facts stated in the *Erie* Defendants' Statement of Material Facts—assuming that they allege strip searches that are, for some reason, unconstitutional—are sufficient to allow a reasonable jury to find that the individual Defendants are personally liable for their subordinates' wrongdoing. Section 1983, as noted, does not allow liability to be imposed on a *respondeat superior* basis. Instead, "'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.'" *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quotation marks omitted). "A plaintiff may establish such personal involvement by making any one of five showings . . .:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuation of such a policy or

---

[26] Because the *Erie* Plaintiffs have not proffered any theory of municipal liability in opposition to the *Erie* Defendants' summary judgment motion, the Court need not, and does not, consider alternate theories of municipal liability, such as ratification or failure to train. *See, e.g.*, *Harris*, 489 U.S. at 387 (holding that, "if a concededly valid policy is unconstitutionally applied by a municipal employee," "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (discussing ratification of constitutional violations). In other words, this Decision and Order is not meant to suggest that, if a municipality has a written policy prohibiting unconstitutional conduct, then the municipality cannot still have a *de facto* policy that is unconstitutional. *See, e.g.*, *Barcume v. City of Flint*, 819 F. Supp. 631, 655 (E.D. Mich. 1993) ("Even with the existence of an anti-discrimination policy, where that policy is allowed to be ignored it may create a policy or custom contrary to that which was officially promulgated.") The Court's decision, as noted several times, is based solely on the facts contained in the *Erie* Defendants' Statement of Material Facts, and the reasonable inferences that can be drawn from those facts.

custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

The *Erie* Defendants' Statement of Material Facts, viewed in the light most favorable to the *Erie* Plaintiffs, does not raise a genuine dispute over any fact that is material to the individual *Erie* Defendants' liability under any of the five theories listed above. As noted, there is no evidence—and the *Erie* Plaintiffs have never suggested—that the individual *Erie* Defendants personally conducted unconstitutional strip searches. Likewise, nothing in the *Erie* Defendants' Statement of Material Facts suggests that the individual *Erie* Defendants were ever "informed of" their subordinates' alleged unconstitutional strip searches. Nothing in the *Erie* Defendants' Statement of Material Facts suggests that the individual *Erie* Defendants "created" an unconstitutional policy—the record, as noted several times, is plainly to the contrary. And nothing suggests that any of the individual *Erie* Defendants "knew or should have known" of alleged unconstitutional strip searches, such that they may be found to be "grossly negligent." *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014). Finally, nothing in the *Erie* Defendants' Statement of Material Facts—even when viewed in the light most favorable to the Plaintiffs—suggests that the individual *Erie* Defendants were provided with "information indicating that unconstitutional acts were occurring." In short, the *Erie* Defendants' Statement of Material Facts, viewed in the light most favorable to the *Erie* Plaintiffs, does not support a claim for individual liability under § 1983 against any of the individual *Erie* Defendants.

The Court therefore grants the *Erie* Defendants' motion for summary judgment against Adam Pritchard and Edward Robinson.[27]

### C. The *Niagara* action (06-CV-291)

Unlike the *Erie* action, the Plaintiffs in the *Niagara* action do not concede that summary judgment against them is appropriate. Instead, before *Florence*, both the *Niagara* Plaintiffs and the *Niagara* Defendants moved for partial summary judgment. Following *Florence*, the *Niagara* Defendants renewed their motion for summary judgment, while the *Niagara* Plaintiffs moved to amend the complaint.

Before resolving these motions, however, the Court must address whether the certified class may be maintained in its current form.[28] The Court does so, because, as noted above, courts are "required to reassess their class rulings as the case develops," *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (quotation marks omitted),

---

[27] Individual *Erie* Defendant H. McCarthy Gibson, who is represented by separate counsel, did not file a motion for summary judgment pursuant to Rule 56. He did, however, file a brief arguing that, after *Florence*, "even if Plaintiffs could prove that Defendants implemented the strip search policy alleged, Plaintiffs cannot succeed in this action, and the Plaintiffs' Class Action Complaint is subject to summary dismissal." Docket No. 291 at 5. A court may "grant summary judgment for a nonmovant" "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f)(1). The *Erie* Plaintiffs have been on notice for some time that judgment would likely be entered in favor of *all* the *Erie* Defendants, and they have provided no reason why judgment should not be entered in favor of Defendant Gibson. Moreover, Defendant Gibson was the superintendent of the ECHC, and strip-search policies at the ECHC have been thoroughly litigated in this case. Given these facts, Defendant Gibson's request for dismissal, the amount of time this case has been pending, and the *Erie* Plaintiffs' post-*Florence* litigation strategy, it is appropriate to grant summary judgment for Defendant Gibson. *See* 10A Wright & Miller § 2720.1, at 370-71 ("The practice of allowing summary judgment to be entered for the nonmoving party in the absence of a formal cross-motion is appropriate. It is in keeping with the objective of Rule 56 to expedite the disposition of cases and, somewhat more remotely, with the mandate of Rule 54(c) requiring the court to grant the relief to which a party is entitled 'even if the party has not demanded that relief in its pleadings.'") (quoting Fed. R. Civ. P. 54(c)) (footnotes omitted).

[28] The Court certified two classes in the *Niagara* action, but "Class Counsel was unable to secure a representative Plaintiff" for one of the classes "and also declined to pursue" that class's claims "given [class counsel's] further investigation into Niagara County's practices." Docket No. 80 at 6. Thus, the Court's discussion of the "class" in the *Niagara* case only refers to Class One, which concerns detainees subjected to the NCJ's Policy 1109. *See* Docket No. 51 at 2-3 (describing Policy 1109).

and the parties' summary judgment briefing brings into question the propriety of the class as it is currently certified.

### a. Whether Plaintiff Williams is an adequate class representative

The Court first addresses whether Plaintiff Dedrick Williams remains an adequate class representative. Summary judgment briefing revealed that, as to Plaintiff Williams, there is a genuine dispute over a very material fact: whether Plaintiff Williams was ever strip searched at the NCJ. Plaintiff Williams testified that he was strip searched, but the *Niagara* Defendants claim that he was not, and that he has changed his story. *See* Docket No. 88 ¶¶ 74-82.

Because there is a substantial discrepancy over such a basic question, Plaintiff Williams is no longer an adequate class representative. Questions about his credibility on a fundamental question would likely "unduly burden the class by diverting attention from the substance of the basic claim advanced on behalf of the class." *Kronfeld v. Trans. World Airlines, Inc.*, 104 F.R.D. 50, 52 (S.D.N.Y. 1984). *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming finding that individual would not be an adequate class representative because he "offered differing accounts about the letters that form the very basis of his lawsuit," which would "surely . . . create serious concerns as to his credibility at any trial"); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) ("[I]nconsistent [deposition] testimony could create serious problems with respect to plaintiff's credibility and could become the focus of cross examination and unique defenses at trial, to the detriment of the class. These credibility problems are a basis for denying plaintiff's motion to be named class representative.") *Compare Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177-78 (S.D.N.Y. 2008) (collecting cases for

the proposition that "[im]material" discrepancies in a proposed representative's testimony "do not foreclose a finding of adequacy").   On or before March 16, 2018, the parties are therefore directed to file proposals for how the Court should resolve Plaintiff Williams's claims, e.g., by dismissing or severing them.

### b. Whether the class should include detainees arrested on March 11, 2005

The circumstances surrounding Plaintiff Williams's claims also call into question whether the definition of the class remains proper.   Plaintiff Williams was apparently arrested in what the *Niagara* Defendants rightly characterize as a "bizarre incident" in Niagara Falls City Court.   Docket No. 84-2 ¶ 74.   Neither party disputes that, on March 11, 2005, the presiding judge in that court "arrested an entire courtroom."   Docket No. 88 ¶¶ 74-75.   Specifically, both parties agree that Plaintiff Williams "was in court as part of [a] domestic violence program.   He stated that someone's wristwatch went off.   The judge became upset because he thought it was a cell phone and demanded that the person who had the cell phone stand up.   When no one stood up, the judge ordered that everyone go to jail.   The judge called each person in court up to the bench and revoked their bail. Everyone who did not make bail was then sent to the NCJ."   *Id.* ¶ 75.

Assuming that Plaintiff Williams, together with everyone else who was arrested following the March 11, 2005 incident in Niagara Falls City Court, was strip searched, the circumstances surrounding the searches are, to say the least, unusual.   Rule 23(a)(2)'s commonality requirement asks whether a question of law or fact is "capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   "The claims for relief need not be identical for them to be common;

rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). This means that, "'[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Id.* (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).[29]

The fundamental question the Court must answer in this case is whether searches conducted pursuant to Policy 1109 are "reasonable" within the meaning of the Fourth Amendment. Answering that question requires deferring, to some degree, to the judgment of correctional officials. That deference, however, *may* be unwarranted if "the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence*, 566 U.S. at 322-23. Assuming that those arrested on March 11, 2005 were strip searched (and the record is not clear on whether they were), it is far from certain that strip searching those arrestees was, under the strange and unique circumstances of the arrests, reasonable.[30] In other words, while a strip search may be "reasonable" in the case of the typical arrest and booking— for instance, the arrest described in *Florence*, or the arrest and booking to which the vast majority of NCJ detainees are surely subjected—whether a strip search would be

---

[29] The question of commonality "may sometimes overlap with merits issues, though the determination as to a Rule 23 requirement is not binding on the trier of fact in its determination of the merits." *Id.* at 138. Thus, the Court's comments about claims arising from the March 11, 2005 arrests do not mean that the Court has pre-formed any views about the merits of such claims.

[30] *Cf. id.* at 340 (Roberts, C.J., concurring) ("[I]t is important for me that the Court does not foreclose the possibility of an exception to the rule it announces. Justice Kennedy['s majority opinion] explains that the circumstances before the Court do not afford an opportunity to consider that possibility. Those circumstances include the facts that [the plaintiff] was detained not for a minor traffic violation but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if [he] were to be detained, to holding him in the general jail population.") (citation omitted).

reasonable in the circumstances presented by the March 11, 2005 group arrests is a different question.

As a result, answering the question whether Policy 1109 is reasonable in the mine-run of cases would not "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. That is, it would not necessarily resolve whether alleged strip searches resulting from the March 11, 2005 group arrests were reasonable. And while the circumstances surrounding the arrest of every NCJ detainee are obviously unique, nothing in the record suggests what those differences are or why the differences are constitutionally significant. By contrast, the circumstances surrounding the March 11, 2005 arrests are highlighted in the record, and they have the *potential* to be constitutionally significant.

The Court therefore modifies the class definition in this case to exclude any person who became a class member by virtue of being arrested on March 11, 2005 for being present in a Niagara Falls City Court courtroom in which the entire courtroom was arrested. On or before March 16, 2018, the parties shall file proposals addressing how the Court should resolve claims against those class members.

### c. Whether the class members should be notified before the Court resolves the pending motions

The last issue the Court must address with regard to the class is notification. As with the *Erie* class, the *Niagara* class members have not received notice of their membership in the certified class. But unlike the *Erie* class, the *Niagara* Plaintiffs moved to provide notice to the class members. Docket No. 73. That motion, however, has not been resolved.

Notice is mandatory for a Rule 23(b)(3) class.  *See* Fed. R. Civ. P. 23(c)(2)(B).

And notice should be given "'well before the merits of the case are adjudicated.'"  *Brown*

*v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 51 (1st Cir. 2010) (quoting

*Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995)).  Here, however, both parties

moved for summary judgment before seeking resolution of the motion to provide notice

to the class.[31]

The Court, however, cannot resolve the parties' cross-motions for summary

judgment without first addressing whether the class members should receive notice of

their membership in the class.  "Notice is crucial to the entire scheme of Rule 23(b)(3)":

notice "serves to inform absentees who might otherwise not be aware of the proceeding

that their rights are in litigation so that they can take whatever steps they deem

appropriate to make certain that their interests are protected.  In this way, it guarantees

each class member an opportunity to have a day in court or, at least, to oversee the

conduct of the action by the representatives."  7AA Wright & Miller § 1786, at 492-94.

The Court cannot, then, consider the parties' summary judgment motions—which may

result in judgment being entered for or against the class—without at least considering

---

[31]  The Second Circuit does not appear to have addressed this issue, but other courts of appeals have held that, where the defendant files a motion for summary judgment before the class receives notice, the defendant "effectively waive[s] [its] right to have such notice circulated to the class" and that, "in such cases, the district court's decision binds only the named plaintiffs."  *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995).  *See, e.g.*, *Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1382 (D.C. Cir. 1980); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 759 (3d Cir. 1974) (*en banc*).  The situation here is different, however, because the *Niagara* Defendants moved for summary judgment only after the *Niagara* Plaintiffs did so, and after the *Niagara* Plaintiffs moved to notify the class.  Under these circumstances, the *Niagara* Defendants cannot be said to waived their right to have the class members notified of their membership in the class.

whether the class members should be given an opportunity to enter an appearance or request exclusion. Fed. R. Civ. P. 23(c)(2).[32]

Thus, on or before March 16, 2018, the parties should advise the Court whether the members of the *Niagara* class should receive notice of their membership in the class before the Court considers the pending motions to amend and for summary judgment. If the Court ultimately does not notify the class members, the Court will decertify the *Niagara* class for the same reasons the Court decertified the *Erie* class.[33]

## CONCLUSION

For the reasons stated above, the pending motions in these cases are resolved as follows:

In *Pritchard, et al. v. The County of Erie, et al.*, 04-CV-0534:

(1) The Plaintiffs' motion to decertify the class (Docket No. 315) is granted;

(2) The Plaintiffs' motion for voluntary discontinuance (Docket No. 315) is denied;

(3) The Plaintiffs' motion to amend (Docket No. 303) is denied; and

(4) The Defendants' motion for summary judgment (Docket No. 301) is granted to the extent it seeks judgment against Plaintiffs Adam Pritchard and Edward Robinson. To the extent the Defendants seek summary judgment against former-Plaintiff Juleen Tucker, or against any member of the now-decertified class, that motion is denied as moot. As to Plaintiffs Adam Pritchard and Edward Robinson, the Clerk of Court shall enter judgment in favor of

---

[32] Out of an abundance of caution, the Court will also defer decision on the *Niagara* Plaintiffs' motion to amend until issues concerning class notification are resolved.

[33] The Court resolves the *Niagara* case in this way, rather than by *sua sponte* decertifying the class, because neither party has addressed the pending motion to notify the *Niagara* class. The *Niagara* action is therefore different from the *Erie* action because, in the *Erie* action, both parties moved to decertify the class. *See Erie* Docket No. 293 at 1; Docket No. 315-1 ¶ 4.

Defendants The County of Erie; Patrick M. Gallivan, in both his individual and official capacities; Timothy Howard, in both his individual and official capacities; Donald Livingston, in both his individual and official capacities; Robert G. Huggins, in both his individual and official capacities; and H. McCarthy Gibson, in both his individual and official capacities.

(5) The Clerk of Court shall take all steps necessary to close this case.

In *Williams, et al. v. The County of Niagara, et al.*, 06-CV-0291:

(1) Plaintiff Dedrick Williams is removed as a class representative;

(2) The Court modifies the definition of Class One to exclude any person who became a class member by virtue of being arrested on March 11, 2005 for being present in a Niagara Falls City Court courtroom in which the entire courtroom was arrested;

(3) The Court defers decision on the pending motions to amend and for summary judgment until issues concerning class notification are resolved; and

(4) On or before March 16, 2018, the parties shall:

    a. Propose how Plaintiff Williams' claims should be resolved;

    b. Propose how the Court should resolve claims by class members who were arrested on March 11, 2005 as a result of their presence in Niagara Falls City Court; and

    c. Advise the Court whether the members of the *Niagara* class should receive notice of their membership in the class before the Court considers the pending motions to amend and for summary judgment.

**SO ORDERED.**


Dated: February 22, 2018                          ___*S/Richard J. Arcara*_____
      Buffalo, New York                          HONORABLE RICHARD J. ARCARA
                                          UNITED STATES DISTRICT JUDGE