**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

DEDRICK WILLIAMS, MARQUESSA PAGE, and
CAMILE SMITH,

                    Plaintiffs,                             06-CV-291-A
                                                             **DECISION AND ORDER**

        v.

THE COUNTY OF NIAGARA; THOMAS BEILEIN, both
individually and in his official capacity as Sheriff of the
County of Niagara; SAMUEL MUSCARELLA, both
individually and as Undersheriff of the County of Niagara;
and JOHN SAXTON, both individually and as Major in
the Niagara County Sherriff's Office,[1]

                    Defendants.
_____

      This § 1983 case is before the Court on the Plaintiffs' motion to amend; the

Plaintiffs' motion for partial summary judgment; and the Defendants' motion for summary

judgment. For the reasons stated below, the Plaintiffs' motion to amend and motion for

summary judgment are both denied, and the Defendants' motion for summary judgment

is granted as to Plaintiffs Page and Smith. As to Plaintiff Williams, the Defendants' motion

for summary judgment is denied. Pursuant to Federal Rule of Civil Procedure 42(b), the

Court will order an initial jury trial limited to the factual question of whether Williams was

strip searched after he taken to the Niagara County Jail on March 11, 2005.

## BACKGROUND

      The Court assumes familiarity with this case's lengthy procedural history. The

case began as a putative class action challenging a policy at the Niagara County Jail

---

[1]  Each of the individual Defendant's successors-in-office "is automatically substituted as a party" for all official-capacity claims against the individual Defendants. Fed. R. Civ. P. 25(d).

(NCJ) that, in practice, required certain detainees—namely, those remanded to the NCJ from local jails in Niagara County, New York—to be strip searched prior to being admitted to the NCJ. The Court ultimately certified a class of NCJ detainees.

The Court later decertified the class and removed Plaintiff Williams as a class representative. Thus, each of the named Plaintiffs currently proceeds only on their own behalf. Both parties have filed motions for summary judgment, which they supplemented after the Supreme Court issued its decision in *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012). Also before the Court is the Plaintiffs' motion to file a second amended complaint. The Court addresses each motion in turn.[2]

## DISCUSSION

### A. The Plaintiffs' motion to amend

After the Supreme Court issued its decision in *Florence*, the Plaintiffs moved to amend their complaint to add claims that NCJ officials conduct strip searches "well before detainees are admitted into the custody of the general population of the [NCJ], and before they are given a reasonable opportunity to post bail." Docket No. 114-3 at 1. The Plaintiffs also seek to add a claim alleging that the NCJ's strip search practices violate the New York State Constitution.

---

[2] In an April 5, 2018 status report, the Plaintiffs requested "an opportunity to provide supplemental briefing to the Court on the Defendants' Motion for Summary Judgment, and to bring to the Court's attention decisions from other Federal courts after *Florence* that continue to reiterate where, as here, blanket strips searches are conducted by municipalities well before a detainee enters a County Jail's general population, those strip searches remain unconstitutional." Docket No. 120 at 2. The Court granted the Plaintiffs leave to file such a brief (Docket No. 121) and thereafter granted two requests for extensions of time. *See* Docket Nos. 123 & 125. The Plaintiffs, however, have still not filed their supplemental brief. The Court therefore declines to consider any arguments about post-*Florence* case law that may or may not have relevance to the pending motions for summary judgment.

Federal Rule of Civil Procedure 15(a)(2) provides that, as applicable here, a party "may amend its pleading only with . . . the court's leave. The court should freely give leave when justice so requires." It is well settled that this is a "permissive standard," intended to promote the "strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quotation marks omitted). But this does not mean that "every request to amend must be granted." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620 (2d Cir. 2009). Among the "grounds to deny leave to amend [are] 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Plaintiffs' motion to amend is denied for the same reasons the Court denied the plaintiffs' motion to amend in a companion case brought against Erie County, New York: The Plaintiffs in this case "waited too long to file the motion," and the Defendants "would be unduly prejudiced by the proposed eve-of-judgment amendment." *Pritchard v. County of Erie*, 04-CV-534-A, 2018 WL 1036165, at *6 (Feb. 23, 2018). A court "plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant[s]." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).

As was true in the *Erie County* case, the "record [in this case] does not show that the . . . Plaintiffs sought to raise" their new claims "at any time during" the five-year period

3

between when this case was filed and when the Court "stayed this case in anticipation of *Florence*. To be sure, the . . . Plaintiffs' proposed" amendments "likely did not take on particular resonance until *Florence* largely foreclosed [their] claims. But the . . . Plaintiffs offer no reason why they could not have raised" their new claims "prior to *Florence*." *Id.* Those claims were as available in 2006 (when this case was filed) as they were in 2011 (when the Court stayed this case pending the Supreme Court's decision in *Florence*).[3] "And because those claims were available well before *Florence*, the . . . Plaintiffs have not offered a sufficient reason to excuse their delay in moving to amend." *Id.* Cf. *Cresswell*, 922 F.2d at 82 (observing that, in considering a late-filed motion to amend, "the court is free to conclude that ignorance of the law is an unsatisfactory excuse").

Moreover, as with the *Erie County* case, "this unexplained delay . . . caused at least some prejudice to the . . . Defendants." *Pritchard*, 2018 WL 1036165, at *7. *See Evans v. Syracuse City School Dist.*, 704 F.2d 44, 47 (2d Cir. 1983) ("[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.") (quotation marks omitted). Discovery has been complete in this case for some time. The Defendants assert that, had the Plaintiffs' original complaint included the claims they now seek to add, the Defendants would have pursued different issues in discovery. *See* Docket No. 116 at 17-18 ("While the deposition testimony addresses . . . the issue of the status of inmates being remanded to the NCJ and subjected to the requirements of Policy 1109, it was never a focus of discovery because

---

[3] In deciding that the Plaintiffs' motion to amend was unduly delayed, the Court does not consider the period of time that has passed since *Florence* was decided. The Plaintiffs proposed amending their complaint following *Florence*, but the Court did not act on the Plaintiffs' proposal. Although the Plaintiffs did not seek any action from the Court during the intervening period—or simply move to amend—the Court also shares some of the blame for failing to manage this case more aggressively.

it was not asserted as a theory of liability against the Defendants.")  This claim is quite reasonable because "[t]he Fourth Amendment question" in this case is "very fact dependent."  *Pritchard*, 2018 WL 1036165, at *7.  Thus, to allow the Plaintiffs to amend their complaint would require the Court to reopen discovery.  That, in turn, would constitute a significant burden on the Defendants given that "all of the named defendants in this action (who were the key administrators of the [NCJ] during the relevant time period) are no longer affiliated with the County, Sheriff's Department, or the Facility."  Docket No. 116-1 ¶ 44.  And, of course, "there is obvious prejudice in asking witnesses to recall events that occurred" over a decade ago.  *Pritchard*, 2018 WL 1036165, at *7.

This is more than enough prejudice to deny the Plaintiffs' motion, particularly given that the claims they now seek to add have been available since the day this case was filed.  The Plaintiffs' motion to amend (Docket No. 114) is therefore denied.[4]

## B. The Defendants' motion for summary judgment

### 1. Applicable law

#### a. Summary judgment standard

The summary judgment standard is well settled.  A party is entitled to summary judgment if the party shows "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

---

[4]  As in the *Erie County* case, the Court "offers no opinion on whether the Plaintiffs' proposed amendments would be futile, particularly in light of the fact that the . . . Plaintiffs' proposed state law claim raises apparently novel issues of New York constitutional law, over which the Court would likely decline to exercise supplemental jurisdiction."  *Pritchard*, 2018 WL 1036165, at *6 (citing 28 U.S.C. § 1367(c)(1)).

nonmoving party." *Id.* Thus, a court's role in deciding a summary judgment motion is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

When a party seeks summary judgment on a constitutional challenge to a prison policy—where, as discussed below, the law mandates a degree of deference to the judgment of prison officials—a court "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [a court's] inferences must accord deference to the views of prison authorities." *Beard v. Banks*, 548 U.S. 521, 530 (2006). "Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.*

### b. Municipal and individual liability under § 1983

The Defendants in this case are the County of Niagara and several high-ranking officials in the Niagara County Sheriff's Office, each of whom is sued in both his official and individual capacities. The principles governing liability under § 1983 are different for each type of defendant.

### i. Individual-capacity liability[5]

"In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). *See also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (identifying ways in which a defendant may have personal involvement in a constitutional violation).

### ii. Municipal liability

The principles governing liability for Niagara County are somewhat different than the principles governing liability for the individual Defendants. "A municipality may be liable under § 1983 only 'if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011) and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). A municipality, in other words, "cannot be held 'vicariously liable under § 1983 for [its] employees' actions.'" *Id.* (quoting *Connick*, 563 U.S. at 60) (quotation marks omitted). Rather, "to establish municipal liability under § 1983, a plaintiff must prove that 'action

---

[5]  As noted, each of the individual Defendants is sued in both his official and individual capacities. "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) (citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)). *See also Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003) ("[A] suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent. Therefore, . . . it would be redundant to allow the suit to proceed against the City of Buffalo and the individual city officials in their official capacity.") (citations omitted). None of the individual Defendants moved to dismiss the official-capacity claims against them, but because those claims are duplicative of claims against Niagara County, they are, in effect, merged into the municipal-liability claims. Thus, the Court need not consider the Plaintiffs' official-capacity claims separately from the Plaintiffs' municipal-liability claims

pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick*, 563 U.S. at 60).

### b. The Fourth Amendment as applied to prison strip searches

The Fourth Amendment prohibits "unreasonable searches and seizures." As its text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "The test of reasonableness under the Fourth Amendment," however, "is not capable of precise definition or mechanical application," and, "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).[6]

The context in which a Fourth Amendment "search" occurs helps inform the search's reasonableness. As a general matter, a court considering a Fourth Amendment claim must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* Searches of the sort at issue in these cases present two often countervailing considerations: Detention facilities are "unique place[s] fraught with serious security dangers," *id.*, but, at the same time, it is difficult to "underestimate the degree to which [such] searches may invade the personal privacy of inmates." *Id.* at 560. Balancing those considerations can be difficult, because while "inmates do not enjoy the full range of constitutional rights possessed by unincarcerated individuals, the Fourth Amendment still

---

[6] Of course, subject to several "specific exception[s]," *Riley v. California*, 134 S. Ct. 2473, 2482 (2014), "reasonableness generally requires the obtaining of a judicial warrant." *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). No Plaintiff has suggested that a warrant is required for a non-contact prison strip search.

requires that searches—even those in the prison context—be reasonable." *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983) (citing *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

These principles underlie the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 566 U.S. 318 (2012). *Florence* involved a challenge to a jail policy requiring "strip searches" of all detainees, regardless of the seriousness of the detainee's alleged offense, and regardless of whether any reason existed to suspect that the detainee posed a danger or might be smuggling contraband.[7] The plaintiff in *Florence* was arrested based on a warrant that was later found to be invalid. After his arrest, the plaintiff was taken to a county detention center, where he was held for six days; he was then taken to a county correctional facility, after which he was released. Regulations at the first facility "required every arrestee to shower with a delousing agent," and "[o]fficers would check arrestees for scars, marks, gang tattoos, and contraband as they disrobed." *Id.* at 323. The plaintiff "claim[ed] he was also instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals." *Id.*

The second facility to which the plaintiff was taken had similar requirements. "[A]ll arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search." *Id.* at 324. "When they left the holding cell, they were instructed

---

[7] The Court noted that the term "strip search" "is imprecise." *Id.* at 325. For instance, the term "may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position." *Id.* As used in *Florence*, however, the term "strip search" did "not include any touching of unclothed areas by the inspecting officer." *Id.*

to remove their clothing while an officer looked for body markings, wounds, and contraband. Apparently without touching the detainees, an officer looked at their ears, nose, hair, scalp, fingers, hands, arms, armpits, and other body openings." *Id.* The plaintiff also "allege[d] [that] he was required to lift his genitals, turn around, and cough in a squatting position as part of the process." *Id.* The plaintiff was then required to shower, after which he was allowed to enter the facility. *Id.* No corrections officer at either facility touched any part of the plaintiff's unclothed body. *Id.* at 325.

*Florence*'s analysis began by recognizing the "establish[ed]" principle that "correctional officers must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 328. Moreover, the Court observed, "[t]he task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials.'" *Id.* (quoting *Bell*, 441 U.S. at 548). Thus, the bottom-line rule from the Court's prison-search cases is that "deference must be given to the officials in charge of a jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.* at 330 (quoting *Block v. Rutherford*, 468 U.S. 576, 584-85 (1984)).

In light of these principles, the Court rejected the plaintiff's argument that "more invasive search procedures" were unconstitutional as applied to detainees who were held for less-serious offenses, and for whom there was no "reasonable suspicion of a concealed weapon or other contraband." *Id.* The Court began by observing that "[t]he admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself." *Id.* These risks include the introduction of lice or contagious infections, the risk "posed by the increasing number of

gang members who go through the intake process," and the "most serious responsibility" of "[d]etecting contraband concealed by new detainees." *Id.* at 331-32. Providing anecdotal evidence of the problem of prison contraband—even from the most benign items, such as chewing gun or a pen case[8]—and observing that it "often takes little time and effort" to conceal contraband, the Court concluded that "[i]t is not surprising that correctional officials have sought to perform thorough searches at intake." *Id.* at 333.

With these considerations in mind, the Court observed that "[t]he record" in *Florence* provided "evidence that the seriousness of an offense is a poor predictor of who has contraband," and the record also demonstrated "that it would be difficult in practice to determine whether individual detainees fall within" the plaintiff's "proposed exemption" for detainees who had been arrested for less serious crimes. *Id.* at 334. This was true for several reasons: First, "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals." *Id.* at 334-35 (providing anecdotal examples). Second, "[e]xperience shows that people arrested for minor offenses have tried to smuggle prohibited items into jail, sometimes by using their rectal cavities or genitals for the concealment." *Id.* at 335. Third, "[e]ven if people arrested for a minor offense do not themselves wish to introduce contraband into a jail, they may be coerced into doing so by others"—"for example, [if] a person arrested and detained for unpaid traffic citations is not subject to the same search as others, this will be well known to other detainees with jail experience." *Id.* at 336. And fourth, "[i]t . . . may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search." *Id.* Intake

---

[8] "Chewing gum can block locking devices," while "an overlooked pen case can pose a significant danger": "Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves." *Id.* at 332-33 (quotation marks omitted).

officials "would be required, in a few minutes, to determine"—on pain of possible liability, "or even . . . charges of discriminatory application"—"whether any of the underlying offenses were serious enough to authorize the more invasive search protocol." *Id.* at 337.

Thus, *Florence* held that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id.* at 322-33. Doing so in *Florence* meant that "every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." *Id.* at 322.

*Florence* emphasized, however, that its holding does not apply to every conceivable prison strip search. Specifically, the Court noted that it was not asked "to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338-39. The Court also noted that it was not asked to consider the case of "an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population." *Id.* at 339. *See also id.* at 340 (Roberts, C.J., concurring) ("[I]t is important for me that the Court does not foreclose the possibility of an exception to the rule it announces. Justice Kennedy['s majority opinion] explains that the circumstances before it do not afford an opportunity consider that possibility."); *id.* (Alito, J., concurring) ("join[ing] the opinion of the Court but emphasiz[ing] the limits of [its] holding"); *In re Nassau Cnty. Strip Search Cases*, 639 F. App'x 746, 750-51 (2d Cir. 2016) ("[T]he Supreme Court [in *Florence*] indicated that categorically strip-searching the following two classes of detainees may not pass constitutional muster: (1) detainees

charged with misdemeanors and segregated *alone* from the general population; and (2) detainees charged with misdemeanors and segregated *with other detainees charged with misdemeanors* from the general population.") (emphasis in original).

With these background principles in mind, the Court now addresses the parties' motions for summary judgment.

**2. Facts**

**a. The Niagara County Jail**

The NCJ, located in Niagara County, New York, is "a large facility consisting of two buildings." Docket No. 88 ¶ 67. The NCJ houses, on average, 500 detainees per day, and it processes approximately 6,000 detainees per year.[9] *Id.* ¶ 70. Over 60% of the NCJ's population is being held while awaiting trial on felony charges, or after having been convicted of felony changes. *Id.* It is undisputed that at least "some portion" of the NCJ's population "ha[s] involvement with drugs," either by way of addiction or "the drug trade." *Id.* ¶ 71. It is also undisputed that at least "some portion" of the NCJ's population "ha[s] involvement with gang activity." *Id.* ¶ 72.

Each of the three Plaintiffs in this case testified that he or she was strip searched as part of the NCJ's admissions process. Two of the Plaintiffs—Page and Smith—were strip searched following ordinary arrests. The third Plaintiff—Williams—claims to have been strip-searched following what the Defendants characterize as "a bizarre incident in Niagara Falls City Court" in which the presiding judge "arrested an entire courtroom" after no one admitted to possessing what the judge believed was a ringing cell phone. Docket No. 84-2 ¶¶ 74-75. Given the unique circumstances surrounding Williams' claims, as well

---

[9] Although defense witnesses drew a distinction between "inmates" and "detainees," for convenience, the Court uses the term "detainees" to refer to all persons committed to the custody of the NCJ.

as a factual question concerning whether Plaintiff Williams was actually strip searched, the Court addresses his claims separately from Plaintiffs Page and Smith's claims.

### b. Plaintiffs Page and Smith

As relevant to this case, Smith was arrested for disorderly conduct in June 2006. Docket No. 88 ¶ 23. She was taken to the Niagara Falls City Jail and placed in a holding cell for several minutes, after which she was booked. *Id.* ¶ 24. Smith was then arraigned and bail was set at $250. *Id.* ¶ 25. Smith, however, was unable to contact someone to post bail, so she was held at the Niagara Falls City Jail until approximately 4:00 p.m. *Id.* ¶¶ 26-27. She was not searched in any way during her time at the Niagara Falls City Jail. *Id.* ¶ 27.

That afternoon, Smith and several other detainees were transferred to the NCJ. *Id.* ¶ 28. At the NCJ, men and women were placed in separate holding cells. *Id.* ¶ 29. Each detainee was then called out of the cell, one at a time, and entered a shower room accompanied by a female deputy. *Id.* No one other than the deputy and Plaintiff Smith were present in the room. *Id.*

The deputy instructed Smith to remove all of her clothing, including her underwear; the deputy then used a flashlight to look in Smith's mouth and ears and "felt through [Smith's] hair." *Id.* The deputy also instructed Smith to "lift her breast, bend over and spread her buttocks, and squat down." *Id.* Smith was then provided with a jail uniform. By 7:00 p.m. Smith learned that she had made bail, and she was not transferred to the NCJ's female unit. *Id.* ¶ 30.

Page's experience at the NCJ was similar to Smith's. Page was arrested and taken to the Niagara County Jail in October 2004 for failing to pay parking tickets. *Id.* ¶

33.  After booking, Page was arraigned, and bail was set at $500.  *Id.* ¶ 35.  Page was unable to post bail, and as a result, she was transferred to the NCJ with several other detainees.  *Id.* ¶¶ 34-35.  As with Smith, once Page arrived at the NCJ, male and female detainees were separated.  *Id.* ¶ 36.  Page was then taken to a shower room with a female deputy, and no one else.  *Id.* ¶ 37.  In the shower room, Page was "told to take off her clothes, lift her breasts, and bend over," but the deputy "did not ask [Page] to do anything else."  *Id.*  After exchanging her clothes, Page was placed into another room with other detainees and, eventually, transferred to the NCJ's female unit.  *Id.*

Page was arrested again in December 2005 based on an outstanding arrest warrant.  *Id.* ¶ 39.  Page was transported to the Niagara Falls City Jail, arraigned, and had bail set at $1,000.  *Id.* ¶ 40.  Page was then remanded to the NCJ after failing to make bail.  *Id.*  After arriving at the NCJ, Page was taken directly to the shower room, given a uniform, and subjected to the same search process to which she had been subject in 2004.  *Id.* ¶ 41.  During the search, a female deputy "was on the other side of the shower curtain."  *Id.*  Page then dressed, was taken to a holding room, and transferred to the female unit cellblock until she posted bail several days later.  *Id.* ¶ 41.

### c.  Niagara County Sheriff's Department Policy 1109

The Fourth Amendment issue in this case concerns Niagara County Sheriff's Department Policy 1109.  Policy 1109 states that "[i]t is the policy of the [NCJ] to conduct thorough searches of all inmates within the facility to detect contraband, to deter inmates from fabricating introducing, or conveying contraband and to detect potential security breaches within the facility."  Docket No. 84-3 at 112.  To that end, Policy 1109 establishes a procedure "in regards to the utilizing of the Strip search upon inmates entrusted to the

care of the [NCJ] to detect contraband." *Id.* at 113.  For instance, Policy 1109 requires strip searches of detainees "entrusted to the care" of the NCJ when they reenter their housing units from work detail; following a contact visit; based upon reasonable suspicion; or following a court appearance "whereupon there is a reasonable expectation of contact with the public." *Id.* at 113-14.

In practice, NCJ officials apply Policy 1109 to two categories of detainees: (1) current NCJ detainees who fall into one of Policy 1109's search criteria (for instance, an NCJ detainee who is allowed a contact visit); and (2) detainees who have been remanded to the NCJ from local jails in Niagara Falls, New York; North Tonawanda, New York; and Lockport, New York.  By contrast, Policy 1109 does not apply to detainees who are brought directly to the NCJ following an arrest by the Niagara County Sheriff's Office, the New York State Police, or police departments in Niagara County that do not have their own jail.  Docket No. 84-3 at 69, 74-81.  Those detainees are subject to Policy 1201, which establishes guidance "regarding entrance procedures for persons lawfully committed to" the NCJ.  *Id.* at 104.  *See also id.* at 99 ¶ 21 ("The individual admitted to the facility pursuant to Policy 1201 has not been part of any inmate population, did not know they were going to be confined, and did not have a substantial opportunity to obtain and conceal contraband in anticipation of their commitment to the NCJ.")

The only issue in this case concerns the legality of Policy 1109 as it is applied to NCJ detainees who are remanded to the NCJ after being booked at a local jail in Niagara Falls, Lockport, or North Tonawanda.[10]  (No other municipality in Niagara County has its

---

[10]  There is some confusion in the record about whether all post-arraignment detainees remanded from jails in North Tonawanda and Lockport are subject to Policy 1109.  For instance, the Niagara County Sheriff suggested that *all* such detainees are subject to Policy 1109.  *See* Docket No. 84-3 at 89-90. By contrast, NCJ Captain Daniel Engert testified that detainees from Lockport and North Tonawanda would be subject

own jail and, thus, any person arrested by a police agency in those municipalities would be brought directly to the NCJ and processed pursuant to Policy 1201.)  For example, if a person is arrested in Niagara Falls, he will be booked and admitted to the Niagara Falls City Jail until he is arraigned in Niagara Falls City Court.  *Id.* at 82.  At the end of each day, the Niagara County Sheriff's Office transports a group of detainees from the Niagara Falls City Jail to the NCJ.  *Id.* at 82-83.  That group may include current NCJ detainees who were transported to the Niagara Falls City Jail earlier that day for an appearance in Niagara Falls City Court, and—as is relevant to this case—the group may also include detainees who were arrested, booked at the Niagara Falls City Jail, and remanded to the NCJ after arraignment in Niagara Falls City Court.  *Id.* at 20-21; 82-83.

In practice, then, two different people arrested for the same crime—for instance, one in Niagara Falls and the other in the Town of Lewiston, which does not have a jail— "would be treated differently for the purposes of a strip search."  *Id.* at 29.  The detainee arrested in Niagara Falls would, upon his initial entry into the NCJ, be treated "as though he's [already] an inmate in the [NCJ]," notwithstanding that he had not previously been to the NCJ.  *Id.* at 30.  This means that the detainee would be subject to the same search conditions as any other NCJ detainee: he would be strip searched upon entry to the NCJ, without regard for the crime with which he is charged.  *See id.* at 84-3 at 47 ("The inmate in the [NCJ] . . . is no different than the inmate who is in the Niagara Falls City Jail who is in my estimation transported in a bus which is no different than if I put them all in another

---

to Policy 1109 (as opposed to Policy 1201) only if they are "coming back to the [NCJ] in a bus with other inmates who are already in the system from Niagara County."  *Id.* at 70.  *But see id.* at 71 ("[T]he test is them being in another facility with other inmates and being brought to the Niagara County Jail.")  To the extent that there is a discrepancy in the record about the scope of Policy 1109, that discrepancy is irrelevant to the Court's Fourth Amendment analysis, and it is also irrelevant to the claims of the named Plaintiffs, each of whom was brought to the NCJ from the Niagara Falls City Jail.

housing unit in the [NCJ]."); *id.* at 97 ¶ 14 (observing that "[w]hether an inmate is coming

to the NCJ from a city jail . . . or whether the inmate is returning to NCJ from a work detail,

court appearance, or contact visit, there is a reasonable expectation that those individuals

have had contact with the public and/or others outside of the control of the NCJ staff").

Daniel Engert, the Captain of the NCJ, testified that several security concerns

necessitate strip-searching detainees who are remanded to the NCJ from local jails in

Niagara County.  The first concern arises from the NCJ's inability to know or control the

security protocols at other facilities.  As Captain Engert testified, detainees from the

Niagara Falls City Jail are "processed into a jail that [Captain Engert] ha[s] no control

over"—that is, he has "no control over the processing procedures, . . . the security

procedures, . . . the supervision procedures, . . . [or] the staff that perform those

procedures."  Docket No. 84-3 at 58.  *See also id.* at 49-50 ("They are a different police

agency, they run a different facility, and I don't have any control of their staff, and I don't

have any control of what their procedures are . . . .  That's the Niagara Falls Police

Department's policy and their booking office policy.")  In short, Captain Engert testified

that Policy 1109's strip-search rule is based on the need for NCJ staff to personally ensure

the safety of their facility, rather than rely on another police agency to do so.  As Captain

Engert testified, "it's not . . . good correctional practice to make assumptions [about] the

tactics and the policies and procedures of another facility and . . . and then . . . allow those

[practices] to be. . . avoided or not observed when [detainees] get to the Niagara County

Jail."  *Id.* at 50.

To justify Policy 1109's application to detainees remanded to the NCJ from other

facilities, Captain Engert also identified a concern that such detainees might be more

likely to introduce contraband into the NCJ. Captain Engert, for instance, testified about the "seizure of contraband from inmates who come off the Niagara Falls City Court buses." *Id.* at 25. Captain Engert also identified a concern that, if detainees were not strip searched prior to entering the NCJ from a local jail in Niagara County, those detainees "would certainly be targeted" by other detainees "to be the one who would be bringing contraband into the facility whether [the detainee] wanted to or whether he didn't want to." *Id.* at 30. Indeed, Captain Engert testified that, if the NCJ "had a policy that flagged inmates who would not be subjected to a screening process when they come in the facility," "common sense" would dictate that that inmate "would be utilized, potentially, . . . as [a] vehicle[] for . . . contraband entering into the facility." *Id.* at 39.

### 3. Analysis

#### a. Plaintiffs Page and Smith's claims against the County of Niagara and the individual Defendants in their official capacities.

The Defendants have established that they are entitled to summary judgment as to Page and Smith's claims against Niagara County and the individual Defendants in their official capacities.

As noted above, *Florence* reiterated the "establish[ed]" principle that "correctional officers must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence*, 566 U.S. at 328. *Florence* also reaffirmed that "[t]he task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials.'" *Id.* (quoting *Bell*, 441 U.S. at 548). As such, *Florence* underscored that "courts must defer to the judgment of correctional officials unless the

record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id.* at 322-33.

There is no genuine factual dispute concerning whether Policy 1109, as applied to detainees arriving at the NCJ from local jails in Niagara County, is "reasonably related to legitimate security interests." *Id.* at 328. As an initial matter, *Florence* recognized that keeping contraband out of a prison—the ultimate goal of Policy 1109—"is a most serious responsibility." *Id.* at 332. *See* Docket No. 84-3 at 112 (identifying the purpose of Policy 1109 as "detect[ing] contraband," "deter[ing] inmates from fabricating, introducing, or conveying contraband," and "detect[ing] potential security breaches within the facility").

Policy 1109 reasonably furthers that goal by attempting to eliminate one avenue through which detainees might introduce contraband into the NCJ: By obtaining contraband at another, possibly less secure, facility before being transported to the NCJ. For instance, the record shows that detainees who arrive at the NCJ from other local jails are, prior to remand, sometimes placed in situations where it would be easy to acquire contraband, such as in public courtrooms or during visits with family members or attorneys. *See, e.g.*, Docket No. 84-4 at 84 and 97-98 (personal observation by Defendants' expert witness that North Tonawanda detainees "are in courtrooms and other facilities inside those buildings where on occasion they have direct contact with family members and attorneys"). Compounding the risk posed by such opportunities, Captain Engert has no ability to ensure that officers at other jails take adequate steps to detect and intercept contraband. For instance, Captain Engert testified that detainees at the Niagara Falls City Jail are not subject to "active supervision"—that is, detainees at the Niagara Falls City Jail are not, even in a group setting, consistently monitored by a single

officer.  Docket No. 84-3 at 27-28.  And, notwithstanding whether local jails in Niagara County do employ "active supervision," Captain Engert has "no control over the processing procedures, . . . the security procedures, . . . the supervision procedures, . . . [or] the staff that perform those procedures." *Id.* at 58.  At bottom, Captain Engert testified that "it's not . . . good correctional practice" to base the NCJ's security protocols on "assumptions [about] the tactics and the policies and procedures of another facility." *Id.* at 50.  Particularly when Captain Engert is afforded the deference he is due, this is an eminently reasonable conclusion.

Moreover, as Captain Engert testified, if categories of detainees—for instance, those charged with misdemeanors in Niagara Falls—were not strip searched upon remand to the NCJ, it is "common sense" to think that those detainees might be targeted by other detainees seeking to introduce contraband into the NCJ.  *See id.* at 33 (Cpt. Engert's testimony that if categories of detainees were exempt from a strip search requirement based on the crime with which they are charged, detainees "are in the same courtroom, they know the charges, they know what they are in for. . . . [V]ery easily they could identify who is going to be on the list who is going to be searched and who is going to be on the list who is not going to be searched").  Indeed, *Florence* identified this concern as a "substantial reason" not to mandate, as a matter of Fourth Amendment law, the categorial exemption of certain types of detainees from strip-search requirements. *Florence*, 566 U.S. at 335-36.

It is therefore reasonable for NCJ officials to conclude that detainees remanded to the NCJ from other jails must be strip searched before entering the NCJ.  Prior to remand, these detainees have had the opportunity to obtain contraband from the outside world,

and they have been in facilities whose security policies are either unknown, inadequate, or unverifiable. Moreover, if NCJ officials carved out categories of detainees to not receive a strip search, those detainees might be targeted as potential vehicles for bringing contraband into the NCJ. Taken together, these reasons demonstrate that Policy 1109's application to detainees from Niagara Falls, Lockport, and North Tonawanda is reasonably related to the goal of keeping contraband out of the NCJ.

In response, the Plaintiffs do not identify "substantial evidence showing [that Policy 1109 is] an unnecessary or unjustified response to problems of jail security." *Florence*, 556 U.S. at 322-33. To be sure, the Plaintiffs argue that "the Defendants cannot provide documentation of one single instance where a class member, or anyone, was found to have contraband secreted in a private area." Docket No. 88 ¶ 51. Setting aside whether this statement has support in the record,[11] it does not create a sufficient issue concerning NCJ officials' "professional judgment" "to allow [the Plaintiffs] to prevail on the merits." *Beard*, 548 U.S. at 530. Even if NCJ officials had not identified an instance in which a member of the now-decertified class secreted contraband, it is not unreasonable for NCJ officials to conclude that the practice of categorically strip searching new detainees arriving from local jails is still needed to deter detainees from attempting to bring contraband into the jail. *See also* Docket No. 84-3 at 38 (Cpt. Engert's testimony that "we typically don't have policies that we write or implement because we're responding to something. We try to implement policies that are proactive that prevent those types of facts from being a reality").

---

[11] *See, e.g.*, Docket No. 84-3 at 25-26 (testimony regarding "seizure of contraband from inmates who come off the Niagara Falls City Court buses").

Of course, on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the non-moving party. But in a case challenging a prison regulation, a court's "inferences" regarding "disputed matters of professional judgment . . . must accord deference to the views of prison authorities." *Id.* Thus, even when the facts are viewed in the light most favorable to the Plaintiffs, the Plaintiffs have not identified any evidence that gives the Court reason to question the professional judgment of NCJ officials with regard to the practice of strip searching all detainees remanded to the NCJ from local jails in Niagara County. The Plaintiffs, in other words, have not identified "substantial evidence showing" that Policy 1109, as applied to such detainees, is "an unnecessary or unjustified response to problems of jail security." *Florence*, 566 U.S. at 323. Because the Plaintiffs have not done so, the Court "must defer to the judgment of correctional officials" at the NCJ. *Id.* at 322-23. *See also id.* at 328 ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials.") (quotation marks omitted).

Thus, based on the record before the Court, the Court concludes that Policy 1109, as applied to Plaintiffs Page and Smith, is reasonable within the meaning of the Fourth Amendment. As a result, the Court directs judgment in favor of the County of Niagara and Defendants Beilein, Muscarella and Saxton in their official capacities.

### b. Plaintiffs Page and Smith's claims against the individual Defendants in their individual capacities.

Defendants Beilein, Muscarella and Saxton are also sued in their individual capacities. "In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the

defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

As to Page and Smith's claims, the Court enters judgment for the individual Defendants in their individual capacity for the same reasons the Court entered judgment for the individual Defendants in their official capacities. As stated above, there is no genuine factual dispute concerning whether Page and Smith were "deprived of a federal right" when they were strip searched after being remanded to the NCJ from the Niagara Falls City Jail. Thus, the individual Defendants cannot be liable in their individual capacities. *See generally Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (identifying ways in which a defendant may have personal involvement in a constitutional violation); *Raspardo v. Carlone*, 770 F.3d 97, 128 (2d Cir. 2014) ("Because there was no underlying constitutional violation, liability cannot be imputed to [another defendant] or imposed on the other individual defendants.")

### c. Plaintiff Williams' claims against all Defendants

As the Court noted in a prior Decision and Order, there is a factual dispute over whether Williams, as well as all other detainees arrested as the result of an unusual group arrest on March 11, 2005, were, in fact, strip searched. At his deposition, Williams testified that he was strip searched; the Defendants, however, claim that he was not, and that he has changed his story. The Court has also previously noted that, if Williams was strip searched following the March 11, 2005 incident at Niagara Falls City Court, "the circumstances surrounding [that] search[] are, to say the least, unusual." Docket No. 117 at 35. Specifically, the Court previously noted that, if those arrested on March 11, 2005 were strip searched, "it is far from certain that strip searching those arrestees was, under

the strange and unique circumstances of the arrests, reasonable." *Id.* at 36. Despite the factual question concerning whether Williams was strip searched, the Defendants urge the Court to grant their motion for summary judgment as to Williams. *See* Docket No. 118 at 2-5.

After careful review of the record, the Court cannot conclude that this is one of those "rare circumstance[s]" in which the Defendants are entitled to summary judgment notwithstanding factual disputes in the record. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). In addition to Williams' (admittedly equivocal) testimony that he was strip searched on March 11, 2005, the Court has also considered Captain Engert's testimony that "there were other inmates who were there who we had brought [to court] in the morning who were there for other reasons" who, it appears, were strip searched. Docket No. 84-3 at 23. *See also id.* at 22 ("There were individuals that were strip searched upon . . . entry.") Although it is a close question, when the evidence is viewed in the light most favorable to Williams—as it must be—the Defendants' motion for summary judgment as to Williams' claims must be denied.[12] A trial will be necessary as to Williams' claims.

The Court cannot ignore, however, that there appears to be a serious question concerning whether Williams was strip-searched on March 11, 2005. The answer to that question may be dispositive of Williams' claims: If he was not strip searched, he has no viable Fourth Amendment claim, and the Defendants are entitled to judgment against him.

---

[12] The Defendants argue that, setting aside whether Williams was strip searched, "the type of 'strip searches' described by Mr. Williams in relation to each of his arrests were the sort of 'visual inspection' searches approved by the Supreme Court in *Florence*." Docket No. 118 at 4 n.1. Even if this was true, however, it does not answer the question whether such a search was reasonable following an arrest for which probable cause appeared to be clearly lacking and where it appeared that Williams would be released shortly after his arrival at the NCJ.

If, on the other hand, Williams was strip-searched, his Fourth Amendment claims *might* be viable, given the unique circumstances of his March 11, 2005 arrest.

Federal Rule of Civil Procedure 42(b) states that, "[f]or convenience . . . or to expedite and economize" proceedings, a court "may order a separate trial of one or more separate issues."  Because the question whether Williams was strip searched on March 11, 2005 may be dispositive of his claims, and because of the serious questions concerning whether he was, in fact, strip searched, the Court intends to bifurcate the trial concerning Williams.  The Court will conduct an initial trial limited to the question of whether Williams was strip searched after he was arrested on March 11, 2005.  If the jury finds in favor of Williams, the Court will conduct additional proceedings as necessary.

A conference to set a trial date is scheduled for February 1, 2019 at 9:00 a.m.  Prior to the conference, the parties shall confer regarding the estimated total length of the trial, counsel's availability through summer 2019, and any facts to which the parties might be able to stipulate to streamline proceedings.  At the conference, the parties should also be prepared to address whether, if the jury finds for Williams, the remaining issues in this case require a jury trial and, if so, whether the same jury must be retained.

### C. The Plaintiffs' motion for partial summary judgment

Prior to the Supreme Court's decision in *Florence*, the Plaintiffs filed a motion for partial summary judgment as to liability.  That motion was premised on "a long line of case authority within the Second Circuit that ha[d] found blanket strip searches of pretrial detainees charged with misdemeanors and minor offenses to be unconstitutional." Docket No. 80 at 7.  The Second Circuit has since recognized, however, that its prior case law concerning the constitutionality of "visual body cavity searches" of misdemeanor

arrestees "before [they are] placed in the general prison population" "is likely no longer good law in light of" *Florence. Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013) (citing *Shain v. Ellison*, 273 F.3d 56, 60 (2d Cir. 2011)). Because the Plaintiffs' motion for partial summary judgment was premised on since-overruled case law, the Plaintiffs' motion is denied.

## CONCLUSION

For the reasons stated above, the Court denies the Plaintiffs' motion to amend (Docket No. 114); denies the Plaintiffs' motion for partial summary judgment (Docket No. 80); and grants the Defendants' motion for summary judgment (Docket No. 84) as to Plaintiffs Page and Smith. The Defendants' motion for summary judgment is denied as to Plaintiff Williams. A meeting to set a trial date concerning the question whether Plaintiff Williams was strip searched on March 11, 2005 is scheduled for February 1, 2019 at 9:00 a.m.

This Decision and Order "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). Thus, the Clerk of Court shall not, at this time, enter judgment against Plaintiffs Page and Smith.

**SO ORDERED.**

Dated: January 3, 2019                ___*s/Richard J. Arcara*___
    Buffalo, New York                  HONORABLE RICHARD J. ARCARA
                                       UNITED STATES DISTRICT JUDGE